[Civ. No. 29462. Second Dist., Div. One. May 6, 1966.]

SOUTHERN PACIFIC COMPANY, Plaintiff and Appellant, v. CITY OF LOS ANGELES et al., Defendants and Respondents.

Randolph Karr and Alan L. Freedman for Plaintiff and Appellant.

Roger Arnebergh, City Attorney, Bourke Jones and Claude E. Hilker, Assistant City Attorneys, for Defendants and Respondents.

LILLIE, J.—Southern Pacific Company, as the owner of certain property abutting on South Alameda Street in Los Angeles, applied for a permit to build a warehouse thereon. When the city refused to issue such permit unless compliance was had with section 12.37 of the Los Angeles Municipal Code, requiring petitioner to dedicate a portion of its property to the city for street widening purposes in accordance with its master plan of community development, Southern Pacific brought this mandamus proceeding to compel the issuance of such permit. The trial court having found against petitioner's claims that section 12.37 is unconstitutional on its face, and as applied to the facts at bar, petitioner has appealed.

With certain limited exceptions, section 12.37 provides, in essence, that no building or structure shall be erected or enlarged upon any lot in an R3 or less restrictive zone (therefore including the M3 zone in which petitioner's property is located), if such lot abuts upon a major or secondary highway, unless the half of the highway adjacent to such lot has been dedicated and improved to its master planned width. The trial court found that the above section is part of the city's comprehensive zoning plan made necessary by an extensive population growth; that the existing street system within the city is materially deficient and inadequate, increasing with the population explosion and the accompanying increase in motor vehicle registration and building construction; that the provisions of section 12.37 benefit both petitioner's property and the public generally; that the conditions imposed by section 12.37 are neither arbitrary nor unreasonable; that section 12.37 does not deprive petitioner or others of the entire use or economic benefit of their property, contains reasonable classifications and provides adequate standards for its enforcement; that the warehouse in question will generate increased traffic on South Alameda and will further congest traffic by the addition of railway lines to service the same: and that the required dedication will not cause petitioner undue hardship or financial loss.

The foregoing findings are opposed, generally and specifically, to the several contentions made by petitioner below and renewed on this appeal—that section 12.37 authorizes an unconstitutional taking of property without just compensation contrary to article I, sections 1 and 16 of the California Constitution and the Fifth and Fourteenth Amendments of the federal Constitution, and accordingly, is not a noncompensable taking under the police power. Further constitutional

objections to the ordinance assert that the requirement of a dedication as a condition precedent to a building permit violates the equal protection clauses of both state and federal Constitutions, and that the ordinance is vague and uncertain and results in an unconstitutional delegation of legislative authority.

Section 12.37 is assertedly a zoning ordinance, appearing under an article of the municipal code entitled "The Comprehensive Zoning Plan of the City of Los Angeles." It is contended by appellant that "A zoning ordinance may not be used as a device to take property for public use without the payment of compensation." (*Kissinger* v. *City of Los Angeles*, 161 Cal.App.2d 454, 462 [327 P.2d 10]), such action being contrary to the protection guaranteed by the federal and state Constitutions in that regard. To such contention respondents reply that the dedication or taking under the subject ordinance is a form of "police power acquisition" as contrasted to acquisition by eminent domain. In *Ayres* v. *City Council of Los Angeles*, 34 Cal.2d 31 [207 P.2d 1, 11 A.L.R.2d 503], where the court upheld the validity of conditions to the approval of a subdivision that the subdivider dedicate part of the land for street purposes, there was an approving reference to cases from other jurisdictions "where the distinction was made between the exercise of authority in such proceedings and the exercise of the power of eminent domain. In each of those cases it was held that the requirement for the dedication of land to the widening of existing streets was not a compulsory taking for public use; but that where it is a condition reasonably related to increased traffic and other needs of the proposed subdivision it is voluntary in theory and not contrary to constitutional concepts." (P. 42.) In other decisions involving land development, though not pertaining to subdivisions as such, the courts have recognized that dedication can be required under the police power as a condition thereto. (*Bringle* v. *Board of Supervisors*, 54 Cal.2d 86 [4 Cal.Rptr. 493, 351 P.2d 765]; *Mitchell* v. *Morris*, 94 Cal.App.2d 446 [210 P.2d 857].) Concededly, no appellate decision has been rendered in this state passing directly upon the factual situation at bar. By analogy, however, both sides claim that *Ayres* and *Bringle* favor their respective positions.

It is urged by appellant that *Ayres* and *Bringle* should be limited to the circumstances there presented. In *Bringle,* it is pointed out, the petitioner was asking for a zone variance, the granting of which lay largely in the discretion of the body

empowered to issue the same. In *Ayres,* the dedication was a proper condition imposed on the subdivider; since he sought to acquire the advantages of lot subdivision, the court properly held that there rested with him the duty of complying with reasonable conditions for its improvement, including reasonable access by the purchasers of lots to the property purchased. Here, however, the property is already zoned for the proposed use; having met the requirements for the issuance of a building permit, appellant claims it is entitled to such permit as a matter of law. (*McCombs* v. *Larson,* 176 Cal.App.2d 105 [1 Cal.Rptr. 140].) Too, any benefit resulting from the widening of Alameda Street (as here proposed) would inure to the benefit of the public generally and not so much to appellant or other landowners specifically. Stated otherwise, since the general growth of the community has made necessary the condition (of dedication) provided by the ordinance, the improvement should be borne by the community and not by the individual landowner.

In light of the above, appellant argues that broad language appearing in landmark zoning cases which emphasize the flexibility of police power should not be applied to ordinances such as the one before us. For example, in *Euclid* v. *Ambler Realty Co.,* 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016], it is declared: ''Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise.'' (P. 387.) Likewise, in *Miller* v. *Board of Public Works,* 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]: ''Thus it is apparent that the police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life and thereby keep pace with the

social, economic, moral, and intellectual evolution of the human race. In brief, 'there is nothing known to the law that keeps more in step with human progress than does the exercise of this power.' '' (P. 485.) More recently, in 1962, both of the above passages were quoted with approval in *Consolidated Rock Products Co.* v. *City of Los Angeles*, 57 Cal.2d 515, 521-522 [20 Cal.Rptr. 638, 370 P.2d 342].

But in *Consolidated Rock* the court made use of language, less broad than hereinabove referred to, with which to indicate its approval of comprehensive zoning legislation, specifically its value for the promotion of the material welfare of a people. The *Pennsylvania Coal* case (*Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321]) decided in 1922 and relied on here by appellant, was distinguished and held inapplicable to such legislative enactments: ''It was decided before the principles of comprehensive zoning were established. . . .'' (P. 528.) Earlier in its opinion the court pointed out that ''When the Supreme Court of the United States in 1926 set its seal of approval upon the constitutionality of this then new type of legislation in *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016], the cycle was completed, and comprehensive zoning in the short space of ten years had taken its place as a constitutionally recognized part of our legal and political system. We indulge in this bit of legal history because, as will appear, plaintiffs place their principal reliance upon language first found in cases decided long before the principle of comprehensive zoning was anywhere applied in this country or its constitutionality established.'' (P. 521.) The court then went on to state that ''As a corollary to this recognized principle of the capacity of the police power to meet the reasonable current requirements of time and place and period in history is the equally well settled rule that the determination of the necessity and form of such regulations, as is true with all exercises of the police power, is primarily a legislative and not a judicial function, and is to be tested in the courts not by what the judges individually or collectively may think of the wisdom or necessity of a particular regulation, but solely by the answer to the question is there any reasonable basis in fact to support the legislative determination of the regulation's wisdom and necessity?'' (P. 522.)

In section 12.02 of the Municipal Code the purpose of the subject comprehensive zoning plan is declared in pertinent part as follows: ''The purpose of this Article is to consolidate

and coordinate all existing zoning regulations and provisions into one comprehensive zoning plan in order to designate, regulate and restrict the location and use of buildings, structures and land, for agriculture, residence, commerce, trade, industry or other purposes; to regulate and limit the height, number of stories, and size of buildings and other structures, hereafter erected or altered. . . . Further, such regulations are deemed necessary in order to encourage the most appropriate use of land; to conserve and stabilize the value of property . . . to prevent undue concentration of population; to lessen congestion on streets; to facilitate adequate provisions for community utilities and facilities such as transportation . . . and other public requirements; and to promote health, safety, and the general welfare, all in accordance with a comprehensive plan.'' Implementing the purpose of the overall plan, as above declared, are numerous specific requirements regulating the use of private property; included thereunder are provisions for off-street automobile parking and access driveways. Also included (§ 11.50 et seq.) are provisions regulating certain subdivisions under local control delegated to municipalities by the Subdivision Map Act (Bus. & Prof. Code, § 11500 et seq.) and securing street dedications pursuant thereto.

 We are of the view that there is validity to respondents' argument that since the courts have recognized that the Legislature may properly insist upon dedication of the means of access—and that, of necessity, implies sufficient access—both in subdivision and nonsubdivision cases, a flexible police power may require the dedication of additional access, under the circumstances here, when the need therefor arises. Thus, in *Bringle* (a nonsubdivision case) the court noted that conditions may be attached to the granting of a variance in order to preserve ''the general purposes and intent of the zoning ordinance.'' In our case, as shown above, one of the purposes of the comprehensive zoning ordinance is ''to lessen congestion on streets . . . to facilitate adequate provisions for community utilities and facilities such as transportation.'' Continuing, ''One of the general purposes is to provide for adequate streets and highways, and a street that might be adequate for the needs of an agricultural area might be inadequate if part of the area is to be used for another purpose.'' Mention is then made of *Ayres*; it is described as ''*an analogous situation*'' where the court ''held that a city may require the dedication of land for the widening of an existing street as a condition to its approval of a subdivision map and that such

a condition, where reasonably related to the *increased traffic* and other needs of the proposed subdivision, does not constitute a taking of private property without compensation." (Italics added.) (54 Cal.2d 86, 88-89.) In this latter connection the court pointed out that Bringle, the landowner, made no showing as to the effect on traffic conditions of the use of his excavating business or that the need for widening the street was not related to the proposed use of the street, nor to any master plan of the county. The court's reference to the county's "master plan" is particularly significant because in *Ayres* it determined that the required dedication for street widening purposes was proper since it related not only to the general welfare of the lot owners but also "of the public." (34 Cal.2d 31, 42.) In the present case, of course, the trial court was benefited by the receipt in evidence of the comprehensive zoning ordinance as well as by expert testimony of the beneficial impact on the area, traffic-wise, by the subject legislation.

Recapitulating, if *Bringle* is analogous to *Ayres*, then the present proceeding is analogous to both those cases under the process of reasoning adopted by our Supreme Court to establish such analogy. In *Wine* v. *Council of City of Los Angeles*, 177 Cal.App.2d 157 [2 Cal.Rptr. 94], cited by appellant, the problem was not quite the same as ours; we have also noted the criticism of *Bringle* in 13 Hastings Law Journal 401, but it still governs here, such criticism notwithstanding. Numerous authorities, state and federal, have also been cited by each side. It will suffice to observe that they reflect the continuing conflict between the public interest manifested through the exercise of the police power on the one hand, and on the other hand, the property interest of the land owner which is disclosed through the exercise of eminent domain. ■ As pointed out in *Bacich* v. *Board of Control*, 23 Cal.2d 343, 351 [144 P.2d 818] : "In some degree those opposed policies are manifested in the conflict between the constitutional mandate that compensation be paid when private property is taken . . . for a public purpose and the exercise of police power where compensation need not be paid. The line between those two concepts is far from clearly marked." Each case, of course, must stand or fall on its own particular facts; and in our view the decision in *Ayres* is still another application of the principle that the exercise of the police power in traffic regulation cases "is simply a risk the property owner assumes when he lives in modern society under modern traffic condi-

tions'' (*People* v. *Ayon,* 54 Cal.2d 217, 224 [5 Cal.Rptr. 151, 352 P.2d 519])—and particularly if he lives in the metropolitan area of Los Angeles.

Our conclusion that the ordinance is not unconstitutional on its face finds further support in light of the fact that it is appellant, not respondents, who wishes to put its property to the use now contemplated notwithstanding the increase in traffic which will be generated thereby. If it desires the benefits resulting from the improvement or change in the character of the land, it must meet any reasonable condition imposed by respondents before the issuance of a building permit—such undoubtedly is the holding in *Ayres,* which case is cited with approval by the New York Court of Appeals as another instance where compliance with pertinent local ordinances has been sustained as a valid exercise of the police power. (*Brous* v. *Smith,* 304 N.Y. 164 [106 N.E.2d 503].) Said the New York court: ''Of course, no one may question that the town, were it desirous of constructing a road across petitioner's property, would have to condemn the necessary land and compensate petitioner. But the town here has no such desire or design and does not seek to condemn land owned by petitioner. It is petitioner who wishes to construct dwellings on his property, and the town merely conditions its approval of such construction upon his compliance with reasonable conditions designed for the protection both of the ultimate purchasers of the homes and of the public. That the state may empower the town to do this, is clear '. . . the subjection to the police power of all property gives the state the right to forbid the use of property in the way desired save under reasonable conditions, promoting the public welfare. . . .' '' (106 N.E.2d 503, 506-507.) To the same general effect is *City of Buena Park* v. *Boyar,* 186 Cal.App.2d 61 [8 Cal.Rptr. 674], where the court sustained the imposition of a condition on a subdivider to pay $50,000 to help in the construction of a drainage ditch which would serve the needs not only of the lot owners but also those of the city generally. Citing *Ayres,* the court declared that ''The subdividing of land is a privilege to which the Legislature has attached certain conditions.'' (P. 67.) Again, although appellant insists otherwise, we perceive no rational distinction between the ''privilege'' conditionally accorded subdividers and that reflected by appellant's desire to improve its property under the circumstances here present.

Appellant nonetheless points out that police regulations

may validly be imposed only "if they constitute a reasonable exertion of governmental authority for the public good." (*State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, Inc.,* 40 Cal.2d 436, 440 [254 P.2d 29].) Since it is also held in the above case that "Whether there has been a reasonable exercise of the power is a court question" (p. 440), we are called upon to determine whether, under the record before us, there exists any necessity for the enactment of the ordinance. ▮ Although the reasonableness of a legislative enactment is a court question, at this stage of the proceedings the determination below must be sustained if the necessity and propriety of the legislative action is one upon which reasonable minds may differ. (*Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, 532.) ▮ Governed by such rule, and upon an examination of the evidence presented, we have no hesitancy in finding that all the relevant circumstances justified the legislation here challenged. Competent testimony established that the tremendous population and industrial growth of Los Angeles has been accompanied by an even greater increase in the number of vehicles used with resulting highway deficiencies and congestion. A master plan is essential to guide the growth of the city. Such plan presently calls for major highways of 100 feet and major roadways of 80 feet, while secondary highways and roadways will approximate 86 feet and 66 feet, respectively. At the time of trial the city was attempting to effectuate its master plan through voluntary dedications,[1] automobile gas tax funds and section 12.37, the subject ordinance. There was also testimony that because of lack of public funds, if eminent domain represented the only means available to obtain street widening for existing streets, it would take more than 100 years to achieve the desired goals. Property along major and secondary highways is usually zoned for intensive uses such as multiple dwellings, industry and commerce. Freeway openings normally provide only temporary reductions on adjacent surface streets. While the central city area of Los Angeles is being aided by reason of the greater accessibility provided by freeways, the failure to correct the inadequate surface street system will adversely affect that area's redevelopment. Still other considerations could be mentioned to establish the necessity of section 12.37 or some similar measure to combat and improve the situation

---

[1]The city had then received some 1,104 voluntary dedications, because an increase in land value is assertedly realized by property abutting upon a fully dedicated highway with greater accessibility.

depicted above. ■ We pass, therefore, to a determination as to whether the legislation can be constitutionally applied to this appellant.

There was evidence that appellant's proposed warehouse would occupy approximately 3½ acres of land and over 5 acres of floor area. Twenty railroad cars and 48 trucks could be accommodated at a single time and could be operated, if desired, by tenants on a 24-hour basis. If so used, more than 1,000 trucks would be utilized each day. The site of the warehouse is located in the city's major produce terminal—other goods and merchandise delivered to that point are distributed throughout the city by truck. The intersection of 8th and Alameda Streets is now over capacity and will be even more so by 1980, at which time the traffic count will have increased to approximately 50,000 vehicles per day. The progress of traffic is always slowed by the entry of trucks into the traffic flow —being further affected in that regard by the operation of appellant's railroad lines. Access to Alameda Street is essential to appellant's operation, Alameda being a major north-south truck traffic route second in use only to the Harbor Freeway. At the time of trial six dedications along Alameda had been offered pursuant to section 12.37; while portions of that street already met the width contemplated under the master plan, the remainder of Alameda within the freeway loop should meet the master planned width within the next two to five years. Even a widening of only one block will have a beneficial effect on the overall traffic flow. Too, as noted in footnote 1, *supra*, as a general proposition the increased accessibility of the property increases the value of the property. Although the burden lay with appellant to show that the ordinance is invalid in its application to appellant's property, one would have expected some showing that it should be excepted from the general proposition just mentioned. In the absence thereof, the trial court properly determined that the proposed dedication of a small portion of appellant's land, less than one-fifth of an acre from a parcel of some 50 acres, would work no undue hardship but, to the contrary, would be of benefit not only to appellant's operations but also to the value of its land. We are satisfied that appellant has presented no valid argument which militates against the enforcement of the subject ordinance.

■ There is no merit to the further claim that the ordinance is constitutionally objectionable because it violates the equal protection clause of the federal and state Constitutions

According to appellant, the subject ordinance does not require property owners in an R-2 or more restrictive zone to dedicate a portion of their land should they desire to erect a duplex or a certain type of office; accordingly, they rely on *People* v. *Western Fruit Growers, Inc.*, 22 Cal.2d 494 [140 P.2d 13], which declares that a law "is special legislation if it confers particular privileges, or imposes peculiar disabilities or burdensome conditions, in the exercise of a common right, upon a class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law." (P. 506.) But owners in an R-3 or less restrictive zone (where appellant's property is located) do not stand in precisely the same relation to the law as do owners in R-2 zones. A new single-family dwelling or duplex in an R-2 district does not generate the increase in traffic that would be the result if a new apartment building or a warehouse (such as appellant proposes to build) were erected in an R-3 area; consequently appellant and others so situated stand to receive much more benefit if a street in their area is widened by resort to the present ordinance. Appellant also poses certain hypothetical situations which assertedly offend against the equal protection clause. Even if such claims might possibly be valid, which they are not, "The situations conjured up by [appellant] are not here involved, and [appellant] is limited in his attack to the application of the statute to the factual situation now before the court." (*Wholesale Tobacco Dealers Bureau* v. *National etc. Co.*, 11 Cal.2d 634, 661 [62 P.2d 3, 118 A.L.R. 486].) Appellant, however, does urge an additional point which should be answered; citing *City of Los Angeles* v. *Offner*, 55 Cal.2d 103 [10 Cal.Rptr. 470, 358 P.2d 926], it is contended that the present ordinance results in unequal taxation. *Offner* holds that a city ordinance setting up a special sewer assessment is invalid where the costs assessed exceeded the cost of the improvement within the district; from this appellant argues that owners of land abutting streets and who desire to improve their property are specially taxed by the ordinance's dedication requirement which inures to the benefit of the general public. In *Offner*, however, it does not appear that the court was called upon to determine, as we have had to do, the taking of land without compensation for the particular needs in question; it was strictly a sewer assessment proceeding and should be so limited. ■ Too, the court in *Offner* was not confronted with the type of argument, rejected in *Ayres*, that the land owner should not be required to bear a

financial loss for the sake of the city; as pointed out in *Ayres*, each additional subdivision adds to the traffic burden, and the fact that the street widening dedication would incidentally benefit the city as a whole is an irrelevant consideration.

Appellant's final constitutional objection to the ordinance is that it is vague and uncertain; accordingly, since no sufficient standards are prescribed to guide the administrative officer charged with its enforcement, the result is an unlawful delegation of legislative authority. (*Agnew* v. *City of Culver City*, 147 Cal.App.2d 144, 153-154 [304 P.2d 788].) Specifically, appellant argues that no concrete standard is furnished for the granting of variances from the requirement of dedication, the only guideline being compliance with the "spirit and intent" of the act. A Texas case (*Texas Consol. Theatres* v. *Pittillo* (Tex. Civ. App.) 204 S.W.2d 396) holds that such language is too vague to constitute a proper guideline; but, as pointed out in *New York* ex rel. *Lieberman* v. *Van De Carr*, 199 U.S. 552 [26 S.Ct. 144, 50 L.Ed. 305], the practicability of a given situation has some bearing in the determination of how much discretion may be lawfully delegated to an administrative officer. Thus, the ordinance upheld in *Bringle* involved a delegation of authority to "impose such conditions on the issuance of the permit as it determines proper to provide for the maintenance of the integrity and character of the neighborhood and the general purpose and intent of the ordinance." (54 Cal.2d 86, 88.) ▮ Too, as in *Mitchell* v. *Morris*, 94 Cal.App.2d 446, 449 [210 P.2d 857], a sufficient standard can also here be found by reference to the comprehensive zoning plan considered in its entirety and with due "regard to the complexity of situations that could arise." ▮ As further stated in *Mitchell*, "discretion is vested in the planning commission, but it is not an uncontrolled and unguided discretion, even though it may call for the exercise of 'judgment of a high order.'" (P. 449.) The present ordinance calls for an awareness by the administrative officers of "practical difficulties" and the avoidance of "unnecessary hardship" in the consideration of a variance from the dedication requirement. While this may call for "judgment of a high order," such guidelines are not so vague as to be constitutionally objectionable.

Appellant's final complaint is that certain findings of the trial court are not supported by the evidence; it also asserts that certain findings requested by appellant should have been made. Although some 60 pages of appellant's opening brief

are devoted to the several points previously discussed, this final contention consumes only six pages of that brief—and there is no further reference to the matter in appellant's reply brief. It seems rather clear, and we are of the view, that appellant is simply rearguing evidentiary matters, which our previous recital establishes, are sufficiently sustained under the record here. For example, appellant challenges Finding XIV that the required dedication "would not cause any undue hardship or financial loss" to appellant; as shown earlier, that phase of the case is simply not as contended for by appellant. ▮▮▮ Appellant had the burden below of establishing its claims that the ordinance is invalid on its face and in its application to appellant; it did not meet that burden. On appeal, it also had the burden of establishing that the challenged findings are without substantial support; it has not met that burden.

For the foregoing reasons, the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied May 27, 1966, and appellant's petition for a hearing by the Supreme Court was denied June 29, 1966.