[L.A. No. 31131. Apr. 14, 1980.]

GEORGE F. WHITE et al., Plaintiffs and Appellants, v. COUNTY OF SAN DIEGO, Defendant and Respondent.

COUNSEL

Asaro & Keagy, Roscoe D. Keagy, Charles F. Campbell and Gideon Kanner for Plaintiffs and Appellants.

Donald L. Clark, County Counsel, Lloyd M. Harmon, Jr., Chief Deputy County Counsel, and Cameron Reeves, Deputy County Counsel, for Defendant and Respondent.

OPINION

**NEWMAN, J.**—Plaintiffs appeal from a judgment denying them declaratory and injunctive relief against special assessments levied by defendant San Diego County to help pay the cost of widening and improving Mission Gorge Road, a major thoroughfare adjacent to the assessed parcels. Plaintiffs contend (1) that the assessments were not justified by any special benefits to their property, and (2) that each parcel's assessment was not in proportion to that parcel's benefits.

As explained below, well-established rules answer the first contention. The second contention presents this issue, new in this court: When a right-of-way is obtained for street widening, is the requirement of proportionality necessarily violated by a policy that fixes the part of each assessment attributable to the cost of acquisition at an amount equal to what was paid for that segment of the right-of-way acquired from the assessed parcel when (1) no similar component is included in the assessment made against parcels from which other segments previously have been dedicated without compensation, and (2) the record and judicially

noticed facts are consistent with a reasonable legislative conclusion that each acquired segment is substantially proportionate in value to the front footage of the parcel from which it is taken?

The project covered 4.5 miles of Mission Gorge Road. Until widened in 1974-1975 the road covered only 40 feet of a 60-foot right-of-way; yet it was used heavily not only for commuting and other through traffic but also for access to commercial enterprises that adjoined the road, including gas stations, drive-ins, shopping centers, trailer parks, and apartment complexes. The project widened the right-of-way to 102 feet and the road to 82 feet, consisting of four 12-foot lanes divided by an 18-foot median (used for left turns) and flanked by 8-foot shoulders (used for parking). A bridge was enlarged; curbs, gutters, sidewalks, storm drains, traffic signals, and related facilities were installed.

Initiated in 1971, the project was financed partly from the county road fund and partly through an assessment district formed under the Improvement Act of 1911 (Sts. & Hy. Code, § 5000 et seq.).[1] The arrangement was the county's first use of Policy J-16, adopted in 1970. It deals with the financing of improvements to highways that were then designated as "Select System roads" (former §§ 186.3, 186.4, 2106). It requires that abutting owners bear the cost of acquiring the right-of-way for and constructing the improvement's "local interest portion," defined as "that portion of the road used primarily for access to adjacent land and generally consist[ing] of a travel lane and parking lane (20 feet in combined width), and concrete curb, gutter, and sidewalk on each side of the through roadway." It states that the county will bear costs of engineering, drainage, appraisal negotiations, and damage to abutting property.

The board of supervisors' resolution of March 14, 1972, which instituted assessment proceedings for the Mission Gorge project, declared that the county would "contribute...the cost of all work abutting publicly owned property...and the cost of all engineering, right of way acquisition (except the actual land purchase cost), construction of two travel lanes, median strip and bridge widening, installation...of... drainage facilities [and] traffic signals, and relocation of any utility not the responsibility of a utility company." The remaining costs were substantially those that Policy J-16 pronounced to be the responsibility of abutting owners.

---

[1] All section references are to the Streets and Highways Code unless otherwise indicated.

On March 6 and June 5, the board adopted plans and specifications and an Assessment District Map delineating a district comprising the property fronting on the improvement. On July 10 the board resolved that the project was "of more than local and ordinary benefit to the public" and declared the new district "to be the district benefited by said work and improvement and to be assessed to pay the costs and expenses thereof." At ensuing hearings the owners, substantially all of whose property was commercial, complained that the project would mostly benefit the through traffic and thus should be paid for out of general funds or by assessing a larger district. On May 8 and June 5, 1974, the board reaffirmed its declarations of special benefit to the described district. The construction contract was awarded in July 1974; the project was completed in October 1975. Of the total cost the assessed owners contributed $649,571; the county, $2,516,009.

One hundred forty-three parcels were assessed as follows: (1) construction cost at $16.50 per front foot less credit for improvements privately constructed; (2) right-of-way costs; (3) administrative expense ($25 plus 0.56 percent of construction cost).

Plaintiffs' main objection to the apportionment of assessments involves the method of assessing right-of-way cost. As explained by county officials at the hearings, the disputed method was "based on the precept that each parcel will provide the right of way for that portion of the road upon which the parcel fronts and the benefit to the parcel is equal to the value of the strip of right of way taken." That value was fixed at either the amount paid for the land or the appraiser's estimate if that amount had not yet been determined. It did not include compensation for elements such as improvements, easements, or damages. There was no right-of-way assessment for 30 parcels from which the right-of-way already had been dedicated under planning and zoning regulations, including an "Official Centerline Ordinance" that conditioned permission for private development on such dedication.

The policy of "assessing back" amounts paid for land taken, not articulated in Policy J-16, seems to have antedated this assessment proceeding. It apparently was articulated at a public meeting held in August 1971 to explain the project.

There is practically no information in the record on variations between ratios of right-of-way assessments to front footage or other parcel characteristics. From statements of protesting property owners and of

officials at the hearings, however, it appears that some owners vigorously negotiated or litigated the amounts they were to receive for rights-of-way and that consequent disparities in compensation paid produced corresponding disparities in the right-of-way component of the assessments.

The board finally confirmed the assessments on January 28, 1976, and plaintiffs filed for declaratory and injunctive relief on February 26 and 27. After a consolidated trial the two actions were consolidated for all purposes. The trial court made findings of fact and conclusions of law, and adjudged against plaintiffs.

### *Did plaintiffs receive a fair hearing?*

Plaintiffs concede that the county adopted the resolutions, held the hearings, and followed all other steps necessary to form the district and impose the assessments. ■ They contend, though, that the board did not accord a fair hearing because it had prejudged critical issues. They point to Policy J-16's formulation of what improvement costs should be assessed against abutting owners and to prior formulation of the scheme that assesses owners (1) for construction costs on a front-foot basis, and (2) for right-of-way costs measured by the amount paid for the strip taken from each assessed parcel.

The contention is without merit. Policy J-16 states that "from time to time the Board may make exception when the application of the policy would result in unusual and unreasonable hardship." Plaintiffs' objections to assessment financing and to assessment policies were fully discussed. ■ Setting up special districts is a legislative process (*Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 683 [129 Cal.Rptr. 97, 547 P.2d 1377]), and a board properly may adopt policies for applying its assessing powers to recurring situations. Mission Gorge presented a familiar problem in many areas of growing population: a narrow road that became congested because of commercial strip-development and the growth of surrounding communities dependent on it for access. The general policies helped provide assurance of evenhanded treatment of similar problems throughout the county. The policies were fully explained at the hearings, and the board could have modified or rejected them had opponents' testimony been persuasive.

*Was the district specially benefited?*

Property may be specially assessed only for improvements that provide it benefits beyond those received by the public. (*City of Baldwin Park* v. *Stoskus* (1972) 8 Cal.3d 563, 568 [105 Cal.Rptr. 325, 503 P.2d 1333].) Plaintiffs contend that the congestion on Mission Gorge Road was due wholly to its use by strangers to the abutting properties, that widening the road was not needed to provide access to those properties, and that accordingly the properties received no benefit that would justify special assessment.

The county's determination of benefit is conclusive unless absence of benefit clearly appears from the record or judicially noticed facts. (*Dawson* v. *Town of Los Altos Hills, supra*, 16 Cal.3d 676, at p. 685; *Larsen* v. *San Francisco* (1920) 182 Cal. 1, 15 [186 P. 757].) The record shows that the project did improve access to the abutting properties, all of which were commercial, by reducing congestion, improving traffic controls (e.g., signals and left-turn lanes), and installing curbs, gutters, sidewalks, and improved drainage. The record shows no absence of benefit; rather it supports the decision to assess the properties for approximately 20 percent of the project's cost. Words in *Allen* v. *Los Angeles* (1930) 210 Cal. 235 [291 P. 393], rejecting a similar property-owner protest, apply here: "That property abutting upon a street improvement will be specially benefited to some extent does not admit of debate. How much and to what extent it may be benefited are questions purely within the exclusive province of the city council and there is nothing appearing upon the face of the proceedings to show that they did otherwise than to fix said district after due consideration of the special benefits to result from the construction of the improvement." (210 Cal. at p. 238; see too *Duncan* v. *Ramish* (1904) 142 Cal. 686, 696 [76 P. 661]; § 5180 (assessment "district may, but need not, include all, or be confined to, or extend beyond, the lots or lands fronting upon the improvement").)

Cases cited by plaintiffs are distinguishable. *Harrison* v. *Board of Supervisors* (1975) 44 Cal.App.3d 852 [118 Cal.Rptr. 828] held only that special benefit from a storm sewer could not be established by the fact that runoff from the assessed properties caused street flooding and traffic problems in nonadjacent areas. *Safeway Stores, Inc.* v. *City of Burlingame* (1959) 170 Cal.App.2d 637 [339 P.2d 933] held only that a store and parking lot having excess car-capacity were not specially

benefited by off-street parking facilities so as to justify their inclusion in a parking district.

### Were assessments proportional to benefits?

Though an assessment must be generally proportional to benefits, it may not be set aside for nonproportionality that does not clearly appear from the record or judicially noticed facts. (*Dawson* v. *Town of Los Altos Hills, supra,* 16 Cal.3d at p. 685.) As already noted, the assessments here consisted of construction costs, right-of-way, and administrative expenses. Construction costs and administrative expenses (except for a miscellaneous $25 charge) were assessed on a front-foot basis. ∎ There is no merit in plaintiffs' contention that the front-foot assessments were improper in that properties do vary in value and in actual and potential use. There is no showing of any variation that would undermine front footage as a permissible basis for assessment. "[T]he amount of each individual assessment is not necessarily measured by the precise amount of 'benefit' flowing to the property owner affected. The assessment is usually based upon the cost of the improvement, spread among the benefited property owners upon some equitable, nondiscriminatory basis. [Citations.] The absence of an exact relationship between the assessment levied and the benefit received will not, however, invalidate the assessment, at least in the absence of fraud, mistake, or gross injustice. [Citations.]" (*City of Baldwin Park* v. *Stoskus, supra,* 8 Cal.3d 563, 568-569; see *People* v. *Lynch* (1875) 51 Cal. 15, 20 ("assessments may be apportioned by reference to the number of feet fronting on the improvement, or to any other standard which will approximate exact equality and uniformity"); *Roberts* v. *City of Los Angeles* (1936) 7 Cal.2d 477, 494 [61 P.2d 323] (upholding frontage assessments for street lighting).)

Plaintiffs attack the assessments for rights-of-way which, as explained above, were based on the compensation paid for land taken for right-of-way over each assessed parcel. By adopting that method did the county "spread [right-of-way cost] among the benefited property owners upon some equitable, nondiscriminatory basis" (*City of Baldwin Park* v. *Stoskus, supra,* 8 Cal.3d 563, 568)?

∎ We first consider the propriety of excluding from assessment for land cost all parcels over which rights-of-way already had been dedicated. It appears (1) that owners of some parcels had previously dedicated rights-of-way without compensation, as required by planning

and zoning regulations, and (2) that the county's Official Centerline Ordinance would require similar dedications from the remaining parcels as a condition to permission to build on them in the future.[2]

Plaintiffs argue that the prior "exaction" of dedications from some owners in return for permission they sought to develop their parcels does not justify "forced dedication" of the remaining parcels. A similar argument was made in *Cogan* v. *City of Los Angeles* (1973) 34 Cal. App.3d 516 [110 Cal.Rptr. 100] by owners of the only property from which rights-of-way for a street-widening project had not previously been dedicated as a condition to permits to build apartment houses. On being assessed back virtually all they had been paid for the taking of their land[3] the owners protested that, unlike their neighbors, they did not wish permission for multiresidential development. Rejecting that argument the court pointed out that special benefits can properly be determined in light of uses to which property might reasonably be put even though some other use is made by the owner. (34 Cal.App.3d at pp. 521-522, citing *Howard Park Co.* v. *City of Los Angeles* (1953) 119 Cal.App.2d 515, 519 [259 P.2d 977].)[4]

As in *Cogan* the present assessees for right-of-way cost, unlike their neighbors who escaped such assessment because they had previously

---

[2]The power to impose reasonable requirements of dedication for street widening as a condition to permission for new land use or development is well settled. (See *Ayres* v. *City Council of Los Angeles* (1949) 34 Cal.2d 31 [207 P.2d 1, 11 A.L.R.3d 503] (subdivision); *Bringle* v. *Board of Supervisors* (1960) 54 Cal.2d 86 [4 Cal.Rptr. 493, 351 P.2d 765] (zoning variance); *Southern Pac. Co.* v. *City of Los Angeles* (1966) 242 Cal.App.2d 38 [51 Cal.Rptr. 197] (building permit). Cf. *Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 640, fn. 6 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847] (open-space dedication by subdivider); *Mid-Way Cabinet etc. Mfg.* v. *County of San Joaquin* (1967) 257 Cal.App.2d 181 [65 Cal.Rptr. 37] (dedication held unreasonable condition to permission for use that would not benefit from or contribute to need for road improvement).)

[3]Of the $5,975 paid plaintiffs, $5,718.56 was assessed back to them and $231.44 was assessed against lots facing a cross-street under a "quarter-block" assessment scheme. (34 Cal.App.3d at p. 519.)

[4]Plaintiffs attempt to distinguish *Cogan* on the ground that the trial court there found not a "predetermined fixed policy" of assessing acquisition costs back from the owner but "a valid legislative determination of benefit to the properties assessed." They assert in *Cogan* it was mere happenstance that the assessment equalled almost the entire amount paid (see fn. 3 *ante*). It is clear, however, that in *Cogan* as here the assessing body *did* have a preexisting policy of assessing back acquisition costs (34 Cal.App.3d at p. 519), and that the finding of good-faith assessments based on individual benefits was not materially different from the trial court's findings and conclusions now before us.

dedicated, received special benefits by being relieved of dedication requirements in the event of future development. The county's recognition of that difference in benefits was directly authorized by section 5360.3, which provides: "In assessing land, credit may be given for dedications and for improvements constructed at private expense."[5]

■ Similarly here it was proper for the county to eliminate right-of-way assessment against parcels from which there had been dedicated the entire strip necessary for the project. It appears that the project called for extending the width of the right-of-way 21 feet on each side of the road. The necessary strips from all parcels thus were of uniform width; they varied in length and area in direct proportion to frontage. Moreover, the record reveals no difference among the strips that would cause substantial disparities in their value in relation to frontage which, as already seen, was a proper guage of proportional benefit. Accordingly, prior dedication of a 21-foot strip along a parcel's entire frontage constituted a contribution of land in proportion to the parcel's benefit and justified the county's giving the parcel full credit against assessment for right-of-way.

■ In assessing the parcels from which the necessary land had not been dedicated, was it proper to measure the right-of-way assessment by the compensation paid for the strip taken? As indicated above, all the right-of-way strips, whether previously dedicated or acquired for the project, could reasonably be deemed to be of substantially the same worth in proportion to area and frontage and thus in proportion to the benefit to be received by the assessed parcel. The record does not show the extent to which the compensation paid may have departed from those proportionate values, but it was not unreasonable for the county to have assumed that such departures were due mostly or entirely to fortuitous variations in the processes of appraisal, negotiation, and litigation leading to the final determination of compensation. Assessing back the compensation avoided inequities based on such fortuities (e.g., making an owner who accepted the county's first offer contribute to an

---

[5]The quoted version of section 5360.3 took effect January 1, 1975 and so appears to have applied to the present assessment, which was not finally approved until January 28, 1976. In any event the prior version, enacted in 1967 and quoted in *Cogan*, 34 Cal.App.3d at page 522, was to the same effect. It provided: "In assessing the land within the district in proportion to the estimated benefits, an adjustment may be made because of the contribution made to the improvement by an owner, either past or present, who has donated land, or any interest in land, which otherwise would have had to be acquired by eminent domain or purchase, or who has done work at his expense which can be used as part of the improvement."

extraordinarily large judgment awarded a neighbor in a condemnation action). Speculation that the spreading of right-of-way costs on a basis other than assessment back might have resulted in correlating some individual assessments more closely with benefits does not invalidate the assessment methods used here, at least in the absence of mistake, fraud, or gross injustice. (*City of Baldwin Park* v. *Stoskus, supra,* 8 Cal.3d at pp. 563, 568-569; *Larsen* v. *San Francisco, supra,* 182 Cal. 1, 8-9, 14-17; *Federal Construction Co.* v. *Ensign* (1922) 59 Cal.App. 200, 213-214 [210 P. 536].)

Plaintiffs finally contend that invalidation of the assessment is compelled by *Spring Street Co.* v. *City of Los Angeles* (1915) 170 Cal. 24 [148 P. 217]. There, assessments for the widening of Eighth Street in Los Angeles were imposed against each abutting lot in the exact amount of a judgment awarded its owner in an action to condemn a five-foot strip for the project. Assessments on that basis were ordered in lieu of proposed assessments based on board-of-public-works estimates of the benefit each lot would receive. The condemnation awards and thus the assessments reflected the substantially greater worth of corner lots arising from their business frontage on important cross-streets in contrast to the proposed assessments, which were based on a determination that lots in the middle of blocks would receive proportionately greater benefit because of their exclusive dependence on the street being widened.

This court invalidated the assessments, declaring that "the compensating benefit to the property owner is...the sole warrant...for...the burdens of these special assessments.... [T]he outermost bound of law and reason...has been reached and passed by the assessment in this case." (170 Cal. at pp. 30-31.) Characterizing the assessment as "manifestly and...grossly unjust" (170 Cal. at p. 31), the court held that the city council's action was not conclusive and continued: "[S]till further we hold that the record here presented furnishes convincing evidence that the assessment was ordered prepared without the slightest exercise of judicial discretion, and so unwarrantedly, arbitrarily, and unjustly, as to work a confiscation of the property and to be, therefore, in no legal sense an assessment at all." (170 Cal. at p. 32.)

In ensuing decisions this court declared that *Spring Street* was an "exceptional" case (*Miller & Lux, Inc.* v. *Drainage District* (1920) 182 Cal. 252, 265 [187 P. 1041]) that authorized judicial invalidation of assessments only if "there appears in the record convincing and conclusive

evidence that under no conceivable conditions could the several parcels of land have been benefited in the proportion stated by the assessment" (*Cutting* v. *Vaughn* (1920) 182 Cal. 151, 156 [187 P. 19]). Applying that standard the court later rejected a *Spring Street* claim that certain properties had been assessed disproportionately less than others for a street improvement. Pointing out that the part of the street adjacent to the seemingly favored properties had been previously graded and paved, the court explained that it was "conceivable that the city council might have determined that the assessment[s] . . . were not disproportionate as to benefits received for the reason that the business property in question had theretofore been assessed to pay the cost of the grading and paving." (*Rutledge* v. *City of Eureka* (1925) 195 Cal. 404, 417 [234 P. 82].)

The present case differs from *Spring Street* in at least three respects. First, there is no showing here of substantial disparity between the values of the rights-of-way taken from each parcel comparable to the showing in *Spring Street* of major differences between values of corner and mid-block lots. Here nothing appears to have made it unreasonable for the county to assume that the strips taken all would have substantially the same value in proportion to length, which varied directly with the parcel's frontage on the road.

A second difference from *Spring Street* is that the present assessments are based on amounts paid for land only and exclude items such as compensation for improvements and severance damage, which were included in the *Spring Street* assessments despite their irrelevancy as a measure of benefit.

Finally, there is no indication in *Spring Street* that dedication of right-of-way either had been or could be required of any parcel as a condition to permission to build.

The judgment is affirmed.

Bird, C. J., Tobriner, J., Richardson, J., and Manuel, J., concurred.

**MOSK, J.**—I dissent.

This matter is controlled by the venerable case of *Spring Street Co.* v. *City of Los Angeles* (1915) 170 Cal. 24 [148 P. 217]. Indeed, the facts here are remarkably similar to those in *Spring Street*.

In that case (1) the city adopted a scheme through which it attempted to recoup its costs of acquiring land for a street widening project by assessing the costs against the abutting property; (2) the city took the right-of-way through condemnation proceedings; (3) the city assessed the abutting property owners the same amount as was awarded for land taken in the condemnation proceedings.

In this case (1) the county, through Board Policy J-16, adopted a scheme by which it sought to recoup the costs of acquisition of the property for street widening by assessing the acquisition costs against the landowners; (2) the county took the right-of-way through settlement negotiations, under threat of condemnation, with the various landowners; (3) the county assessed the landowners the precise amount awarded to them for the right-of-way, thus effectively cancelling out all compensation paid for the taking of private property.

The law at the time of *Spring Street*, and the law today, is that a special assessment for road improvements may be imposed only if there is special benefit, and then only in some reasonable proportion to the special benefit returned to the property by virtue of the improvement. (*City of Baldwin Park* v. *Stoskus* (1972) 8 Cal.3d 563, 568 [105 Cal. Rptr. 325, 503 P.2d 1333].) Under that guiding principle, the *Spring Street* court unanimously rejected the assessment there with this conclusion: "It bears upon the face of the record, as here presented, convincing and conclusive evidence that no effort at all was made by the council to assess in proportion to benefits. It is impossible that under the exercise of any discretion in the matter it could be found that in every case the damage awarded by the court for the taking of the property was exactly or more than covered by the benefit which would accrue to the remaining property by the widening of the street. And it is also impossible that those separate pieces of property were, in addition, each one of them, benefited to the exact added amount which it cost the city to take the condemned land. It is to strain credulity beyond the breaking point to ask that any such belief be for a moment entertained." (170 Cal. at p. 31.)

The majority's lame attempts to distinguish *Spring Street* on its facts fail to undermine the principle for which it stands, and which remains equally applicable to the case at bar.

To comply with that principle the public entity should follow the same steps as the courts that review its action: i.e., "it is necessary first

to identify the benefit which the public improvement will render; next, to determine if the property owners will receive a benefit different from that of the general public; and, finally, to ascertain if the formula on which the assessments are made is based on the benefit received." (*Harrison* v. *Board of Supervisors* (1975) 44 Cal.App.3d 852, 857 [118 Cal. Rptr. 822].) The *Harrison* court found that the "facilitation of traffic is of general benefit to the community," not of special benefit to adjacent landowners. (*Id.*, p. 858.)

The record is devoid of any evidence that the county undertook the required three-step analysis in the instant case. It merely adopted its Policy J-16, which provided that owners of real property abutting a major road would pay the costs of improvements, including construction costs of an identified portion of the road, acquisition costs of the right-of-way, and certain incidental expenses.

The county's scheme is a cynical method of automatically shifting the cost of an improvement benefitting the public onto the backs of a few landowners because of the fortuity of their location. Not only do the landowners lose a portion of their property, but they are then deprived of the constitutionally required compensation for the taking. (Cal. Const., art. I, § 19.) I strongly disapprove of this acquisitive device by which a public entity, in order to obtain private property, puts funds therefor in a landowner's pocket—and then proceeds to pick the pocket.

I would reverse the judgment.

Clark, J., concurred.

On May 14, 1980, the opinion was modified to read as printed above.