Milton L. COULTER, d/b/a Stage Coach Apartments, a limited partnership, Appellant (Plaintiff),

v.

The CITY OF RAWLINS, Glen Woodbury, Mayor, Doug Smith, Pauline Gonzales, Debari Martinez, Jay Grabow, Harlan Patchen and Donald G. Comeaux, as members of the City Council, City of Rawlins, Appellees (Defendants).

No. 5764.

Supreme Court of Wyoming.

April 19, 1983.

Edwin H. Whitehead of Urbigkit & Whitehead, P.C., Cheyenne, for appellant.

Rebecca H. Noecker of Johnson, Mac-Pherson & Noecker, Rawlins, for appellees.

Before ROONEY, C.J., and RAPER, THOMAS, ROSE and BROWN, JJ.

ROSE, Justice.

This appeal involves important questions regarding the power of Wyoming munici-palities to charge developers fees for con-necting their property to water and sewer lines, as well as the power to require dedica-

tion of land or payments in lieu of dedication for parks and recreational purposes. Specifically, we are asked to rule on the validity of several ordinances adopted by the City Council of the City of Rawlins requiring appellant to pay fees for the privilege of connecting his development to the sewer and water system, and one ordinance requiring the appellant to remit to the City a sum in lieu of dedicating a portion of his property for the establishment of a park.

An action was brought by the appellant challenging the authority of the City to enact and enforce the above ordinances. The district court upheld each of the challenged ordinances and, pursuant to a contract entered into by the parties, awarded the City such attorney's fees as were associated with the defense of the action. In response to an adverse ruling, appellant appeals to this court and raises the following issues for our review:

"1. Did the Trial Court err in finding that the City of Rawlins, in enacting ordinances prescribing fees, was acting within power granted it by the Legislature?

"2. Did the Trial Court err in finding that the water and sewer connection fees and the money exacted in lieu of parkland dedication were constitutional, pursuant to powers expressly granted by the Legislature, and proportionate to the burden put upon the facilities of the City by Appellant's apartment complex?

"3. Did the Trial Court err in finding that Appellant, by signing an agreement wherein he, as owner, agreed to reimburse the City for all administrative costs and expenses incurred by the City in the acquisition, construction and equipping of a housing project for low income persons, had left himself liable for attorney's fees and costs in challenging the constitutionality of the fees imposed by the City and paid by Appellant under protest?"

Appellant's position is that the City of Rawlins is without statutory or constitutional authority to enact the challenged ordinances. This argument is premised upon the belief that each of the questioned fees must be characterized as either a tax or assessment and, as such, the City is without authority to burden appellant's property for taxation or assessment purposes.

The City of Rawlins responds by asserting that the charges levied are not taxes or assessments but are such fees or charges as the City may require appellant to pay before developing his property. The City also contends that the challenged ordinances were adopted in compliance with the authority vested in the City Council by the constitution and statutes of the state of Wyoming.

We agree with the position expressed by the City of Rawlins relative to its authority to adopt the challenged ordinances, but we find no authority for the award of attorney's fees. We will therefore affirm in part and reverse in part.

## FACTS

In 1980, appellant Milton Coulter developed a 96-unit low-income housing project in the City of Rawlins, Wyoming. This development is known as the Stage Coach Apartments, which is also the name of a limited partnership in which appellant is the only general partner.

With the onslaught of energy development in Wyoming during the 1970's, the population of Rawlins increased substantially and projections indicate that by 1990 the City's total number of inhabitants will increase 148% over the 1970 population. In response to these projections, the City Council reasoned that the demand for City services such as water, sewer and park facilities would also increase and that there was a need to offset the projected impact. According to a plan developed by the City, it was estimated that approximately $36,-000,000 in capital improvements would be needed to expand the sewer and water system in order to meet the 1990 population estimate.

## THE ORDINANCES

On January 21 and 14, respectively, the City Council of the City of Rawlins adopted Ordinance No. 1B–80 requiring water ser-

vice connection fees and Ordinance No. 1–80 requiring fees for tapping into the City's sewer system. Ordinance No. 1B–80 provides:

"BE IT ORDAINED by the City Council of the City of Rawlins, Wyoming:

"Section 1. Sec. 28–13 of the Code of Ordinances of the City of Rawlins is hereby repealed and Sec. 28–13 is hereby re-enacted to read as follows:

"Sec. 28–13. Water Service connection fees.

"a. A service connection fee shall be charged for each tap on the City of Rawlins' water system, in accordance with the following schedule:

| "Service Connection Size | Minimum Service Connection Fee |
|---|---|
| ¾" | $ 1,000 |
| 1 " | 1,800 |
| 1½" | 4,000 |
| 2 " | 7,100 |
| 3 " | 16,000 |
| 4 " | 28,450 |

"b. Service connection fees for multiple unit residential construction shall be computed at $1,000 for each living unit. In no event, shall the service connection fee ever be less than the minimum specified herein.

"c. Service connection fees for temporary facilities shall be computed at 25 percent of the normal minimum service connection fee for each year or portion of a year that the temporary facility is expected to be in existence.

"d. All service connections larger than three-fourths inch shall be uniform size from the service line tap to the building structure or structures. The Building Official shall reserve the right to require a larger service connection to any building, structure, or development if the water requirements through such service connection may, under normal operation, cause a velocity of ten feet per second as specified in the Uniform Plumbing Code, through such service connection.

"e. Whenever it is necessary to install a water service connection in advance of street construction and prior to actual need of a water service, the service connection fee shall be due and payable at the time the water meter is requested, or a building permit is applied for, whichever comes first. The service connection fee shall be calculated on the basis of service connection fees in effect as of the date of such request for water meter or application for building permit.

"f. Wherever, in the opinion of the Water Superintendent or his duly designated representative, a reduced pressure backflow preventer is required to eliminate contamination of the public water supply through a specified service connection, such backflow preventer of a type and design approved by the Water Superintendent shall be furnished and installed in accordance with the City specifications.

"g. Fees for taps for private fire protection facilities shall be charged in accordance with the following schedule provided, however, that any water service connections tapped to said distribution line extension or private fire protection facility shall be charged for at the applicable rates herein specified.

| "TAP SIZE | MAIN LINE SIZE | TAP CHARGE |
|---|---|---|
| 4" or less | 6" through 12" | $ 500.00 |
| 4" or less | 16" through 24" | 650.00 |
| 4" or less | Over 24" | 750.00 |
| 6" | 6" through 12" | 750.00 |
| 6" | 16" through 24" | 900.00 |
| 6" | Over 24" | 1,100.00 |
| 8" | 8" through 12" | 850.00 |
| 8" | 16" through 24" | 1,100.00 |
| 8" | Over 24" | 1,250.00 |
| 12" | 12" | 1,200.00 |
| 12" | 16" through 24" | 1,400.00 |
| 12" | Over 24" | 1,600.00 |

"h. Construction Responsibility: The City shall, at its expense, make the physical tap on the water main and furnish and install the water meter, and the applicant for the water service connection shall, at his sole expense, provide the trench, service line pipe, conduit for remote reader units where required, pressure reducing valves where required, backflow preventer where required, and shall install same and backfill trench, all in accordance with the specification of the City of Rawlins.

"i. To defray the cost of meters and their installations, the following surcharges shall be added to the connection fees:

"1. For service with a ¾″ × ⅝″ meter, the sum 125 dollars for the meter and meter yoke plus 125 dollars for the meter pit and cover if the meter is located in a pit or vault, plus 150 dollars for pit excavation and backfill, if not provided by the owner.

"2. For service with a ¾″ meter, the sum of 155 dollars for the meter and meter yoke plus 125 dollars for the meter pit and cover if the meter is located in a pit or vault, plus 150 dollars for pit excavation and backfill if not provided by the owner.

"3. For service with a 1″ meter, the sum of 205 dollars for the meter and meter yoke plus 125 dollars for the meter pit and cover if the meter is located in a pit or vault, plus 150 dollars for pit excavation and backfill, if not provided by the owner.

"4. For services with meters larger than one inch, the actual cost of labor, materials and equipment.

"5. For all meters on fire protection lines, the actual cost of labor, materials and equipment.

"j. All water service connection fees and private fire protection tap fees, upon delivery to the City Treasurer, shall be deposited to the credit of a water development fund, to be made available for the purpose of paying water development debts service only."

Ordinance No. 1–80 provided:

"BE IT ORDAINED by the City Council of the City of Rawlins, Wyoming:

"Section 1. Sec. 28–42 of the Code of Ordinances of the City of Rawlins is hereby repealed and Sec. 28–42 is hereby reenacted to read as follows:

"Sec. 28–42. Sanitary sewer tapping fees.

"Sewer development fees: A sanitary sewer development fee for the privilege of tapping or connecting to the sanitary sewer system of the City of Rawlins, Wyoming, is hereby established and imposed, which shall be paid prior to physical connection or the authorizing of construction of any sanitary waste system tying into the City owned sanitary sewerage system, which sewer development fee shall be as follows:

"a. On all multiple family units, condominiums, townhomes, mobile home parks, or any other multiple family dwellings, by whatever description or name, except hotels and motels, there shall be charged a sewer development fee of 750 dollars per living unit.

"b. On all commercial buildings, office buildings, hotels, motels, and business buildings of every description, there shall be a sewer development fee of 750 dollars for the first toilet or urinal, plus 200 dollars for each additional toilet and/or urinal in excess of one. Any structure having as its principal or accessory use a facility that would require a high rate of sewage discharge to the sanitary sewer shall pay a fee to be negotiated by contract and shall bear a reasonable relationship to the size of the water service and the average rate of discharge for a single family dwelling.

"c. On all single family dwelling units there shall be charged a sanitary sewer development fee of 750 dollars.

"d. Sewer development fees for temporary facilities shall be computed at 25 percent of the normal minimum sewer development fee for each year or portion of a year that the temporary facility is expected to be in existence.

"e. Whenever it is necessary to install a sewer tap in advance of street construction and prior to actual need of a sewer service, the sewer development fee shall be due and payable at the same time the water service connection fee becomes due or at the time a building permit is applied for, whichever comes first. The fee shall be calculated on the basis of sewer devel-

opment fees in effect as of the date such fee becomes due.

"f. All sewer development fees, upon delivery to the City Treasurer, shall be deposited to the credit of a sewer development fund, to be made available for the purpose of paying sewer development debts service."

In July of 1980, the City Council enacted Ordinance No. 7–80 providing for dedication of land for parks and open spaces in new residential subdivisions, or, at the City's option, a money payment in lieu of land. The provisions of this ordinance read:

"BE IT RESOLVED BY THE GOVERNING BODY OF THE CITY OF RAWLINS:

"§ 1. That § 30–66 of the Code of Ordinances, City of Rawlins, is hereby repealed and a new § 30–66 of the Code of Ordinances, City of Rawlins, is enacted to read as follows:

"§ 30–66—PARKS, RECREATIONAL SITES AND OTHER PUBLIC PLACES.

"a. All residential subdivisions shall provide for public parks and recreational sites by dedication of land in accordance with these regulations. Subject to the approval of the Planning Commission, dedication of such sites and land areas to the City or at the option of the City and in lieu thereof, the subdividers may make a payment to the City of a sum of money equal to the value of the land which would otherwise be dedicated to the City. The value of the land to be dedicated shall be determined on the basis of full and fair market value of the raw land. The term 'raw land' means land without any improvements such as water and sewer lines, paving, curb and gutter, etc. Fair market values of the raw land shall be determined as of the time of filing the preliminary plat. Any such sums, when required, shall be held by the City for the acquisition and improvement of such sites and land areas. Provision of land areas for parks and recreational sites shall be at the rate of six acres per 1,000 persons in the subdivision. Dedication of such sites and land areas shall be made at the time of final platting in one or any combination of the following ways:

"1. By dedicating to the City of Rawlins on the final plat.

"2. By granting the land areas in fee simple or general warranty deed to the City.

"b. Suitability of Land. Any land to be dedicated as a requirement of this section shall be reasonably adaptable for use of active park and recreational purposes and shall be at a location convenient to the people to be served. Factors used in evaluating the adequacy of the proposed park and recreation areas shall include size and shape, topography, geology, tree cover, access, and location.

"c. The number of persons that is generated by particular land uses or zone districts within a subdivision for purposes of calculating the amount of land area provision for parks and recreation areas shall be based on the following calculations:

| "TYPE OF USE | PERSONS PER DWELLING UNIT |
|---|---|
| Single-Family Dwellings | 4.0 |
| Apartments, duplexes and all dwelling units having two bedrooms | 3.2 |
| All dwelling units having one bedroom, including apartments, condominiums, etc. | 2.5 |
| Dwelling units for the aged, nursing homes, buffet-type apartment units with no bedrooms, etc. | 1.5 |
| Bunkhouses, dormitories, etc., per bedroom, etc. | 1.0 |
| Mobile Homes | 4.0 |

"d. Where it is determined that a greater amount of land is required for parks and open spaces to meet the Master Plan requirements for that area of the City, or where it is determined that land is required for any other type of public facilities, the subdivider at the time of filing the final plat with the Planning Commission must offer to sell at a fair market price to the City, within one year immediately following the recording of the final plat, any land required to be dedicated in accordance

with § 30–36a. If any such proposed public areas have not been purchased by the City within one year after the recording of the final plat, such areas may be subdivided into lots and blocks in accordance with the requirements of this Ordinance.

"e. Whenever cash in lieu of land dedication is required for parks and recreation sites, the fair market value of the raw land shall be determined by mutual agreement between the subdivider and the City Council. In the event of inability of any of the above parties to agree on a fair market value of the sites, an independent party being a qualified appraiser, shall be selected by mutual agreement of the disagreeing parties. Said independent party's findings on fair market value of the site shall be final and binding on all parties. A qualified appraiser shall be a member of the Appraisal Institute (M.A.I.) or an Accredited Rural Appraisal (A.R. A.). The developer shall pay the cost of said appraiser.

"f. Payments made under the requirements of this section shall be made payable to the City of Rawlins. The City Council shall receive such funds at the time of the final plat approval and deposit them with the City Treasurer, who shall in turn deposit such funds in the City approved and designated financial institution within the City. Such funds shall be deposited to special interest bearing escrow accounts. The status of these accounts shall be reported annually to the City Council and shall be made available to the Parks and Recreation Board and the general public. Funds may be withdrawn from the special escrow accounts by the City Council, for the specific purposes of acquiring lands for park and recreation sites respectively and of making improvements to the sites."

These water and sewer ordinances had as their purpose the development of special funds for use in reducing the City's bonded indebtedness which resulted from capital expenditure for the sewer and water system. Ordinance No. 7–80 was designed to create a fund for the expansion and maintenance of the City's park land.

In compliance with these ordinances, the appellant remitted to the City, under protest, $240,750 in sewer and water line connection fees and $119,660.54 as payment in lieu of park-land dedication.

This dispute was initiated and tried upon appellant's complaint which sought a declaratory judgment to the effect that the ordinances were unlawful in that they had been adopted without authority of the laws of the state of Wyoming which pertain to the legislative powers of governing bodies of Wyoming municipalities. The trial judge held that all of the challenged ordinances were adopted pursuant to and in accordance with the powers vested in the City Council of the City of Rawlins by the legislature and that all of the fees were reasonable and rationally related to the legitimate governmental purpose they were designed to further.

The issue which we are asked to address is whether or not the City of Rawlins was empowered by the Wyoming Constitution and various statutes to enact and enforce the three ordinances in question.[1] We first address the ordinances requiring the sewer and water connection fees and will then address the park-land dedication ordinance in a separate section.

## GENERAL CONSIDERATIONS

Before reviewing and discussing the various statutory provisions which we consider applicable to the facts of this appeal, it is necessary to review some general principles of law regarding the powers of a municipal corporation to legislate.

It is settled that municipal corporations are creatures of the legislature and thereby subject to statutory control. 2 McQuillin Mun Corp (3d Ed), § 4.03, p. 8;

1. The briefs and the positions expressed at oral argument reflect that appellant is not challenging the reasonableness of the amount of the charges and is only concerned with the power of the City of Rawlins to adopt them.

*Wyoming State Treasurer v. City of Rawlins,* Wyo., 510 P.2d 301 (1973). Thus, the legislature, except as limited by the Wyoming Constitution, may confer on municipal corporations such authority as it considers proper, and municipalities can exercise only those powers which are expressly or impliedly conferred. 2 McQuillin, supra, §§ 10.08 and 10.09, p. 755; *City of Buffalo v. Joslyn,* Wyo., 527 P.2d 1106 (1974); *Scarlett v. Town Council, Town of Jackson, Teton County,* Wyo., 463 P.2d 26 (1969); *May v. City of Laramie,* 58 Wyo. 240, 131 P.2d 300 (1942); *Edwards v. City of Cheyenne,* 19 Wyo. 110, 111, 114 P. 677 (1911). We have recognized in the past that the powers of a municipality are not necessarily limited to those expressly conferred but that a municipality may also exercise powers fairly and necessarily implied from the grant contained in the statute or constitutional provision. *Whipps v. Town of Greybull,* 56 Wyo. 355, 109 P.2d 805, 146 A.L.R. 596 (1941). McQuillin discusses these implied or inherent powers as follows:

" * * * [I]t is beyond dispute that municipal corporations possess certain implied, sometimes referred to as incidental, powers * * *. Such implied powers include, and are generally held to be limited to, the following:

"1. Powers necessarily arising from those expressly granted, and also those reasonably inferred from the powers expressly granted.

"2. *Powers essential* to give effect to powers expressly granted.

"The municipal corporation may adopt or employ devices, agencies, instrumentalities, or other means for the purpose of carrying out powers expressly conferred on it, although the particular means adopted is not expressly authorized. The corporation cannot, however, under this rule enlarge or extend the power express-ly granted." (Footnotes omitted and emphasis added.) 2 McQuillin, supra, § 10.-12, p. 768.

The parties to this appeal have also drawn into question the effect of the home-rule amendment to the Wyoming Constitution.[2] Appellant argues that such amendment has no bearing on this case or the rules of law discussed above, since the disputed ordinances provide for fees, charges or taxes—items which are still subject to legislative control by the express terms of the amendment, n. 2, supra. Appellee-City, on the other hand, says that this addition to the Wyoming Constitution has the effect of granting the City of Rawlins full control over its "local affairs" and therefore the above-discussed rules of law are for the most part inapplicable. We are of the opinion that our decision in *"Laramie Citizens for Good Government" v. City of Laramie,* Wyo., 617 P.2d 474 (1980), requires us to decide this secondary issue in favor of appellant.

In the last above-cited opinion we noted that, although the home-rule amendment (Art. 13, § 1(b) of the Wyoming Constitution) empowered the City of Laramie to control and determine local affairs, certain areas of municipal authority remained subject to legislative control, including the "levying of taxes, excises, fees, or any other charges." 617 P.2d at 483. As in *"Laramie Citizens for Good Government" v. City of Laramie,* supra, we see the home-rule amendment as having minimal impact on the resolution of the question of the power of the City of Rawlins to adopt the ordinances in issue here. We say this because, under the specific language of Art. 13, § 1(b) of the Wyoming Constitution, this case involves an area of municipal power that remains subject to express legislative

**2.** Article 13, § 1(b), of the Wyoming Constitution provides:

"(b) All cities and towns are hereby empowered to determine their local affairs and government as established by ordinance passed by the governing body, subject to referendum when prescribed by the legislature, *and further subject only to statutes uniformly applicable to all cities and towns, and* *to statutes prescribing limits of indebtedness. The levying of taxes, excises, fees, or any other charges shall be prescribed by the legislature.* The legislature may not establish more than four (4) classes of cities and towns. Each city and town shall be governed by all other statutes, except as it may exempt itself by charter ordinance as hereinafter provided." (Emphasis added.)

control. See: Art. 13, § 1(b), supra n. 2. Having arrived at this conclusion, we regard the previously discussed general rules of law as applicable in all respects.

## THE SEWER AND WATER CONNECTION FEES

As we have said, the thrust of appellant's argument in this appeal is that the City of Rawlins is without any statutory authority to adopt the questioned ordinances because the power of Rawlins to levy taxes or assessments does not include the power to require hook-up fees. The City responds by urging that the relevant statutory provisions pertaining to municipal sewer and water services clearly empower the adoption of both Ordinance No. 1–80 and Ordinance No. 1B–80. In order to resolve the question, a review of the statutory provisions is necessary.

## THE STATUTES[3]

In § 15–1–103(a), W.S.1977 (1980 Replacement), the following general powers of cities and towns are set out:

"(a) The governing bodies of all cities and towns may:

\* \* \* \* \* \*

"(ix) Levy and collect special assessments against persons or property to the extent allowed by the constitution and the law;

\* \* \* \* \* \*

"(xxx) Divide the city into suitable districts for establishing a system of drainage, sanitary sewers and water mains and:

"(A) *Provide and regulate* the construction, repair and use of sewers and drains;

"(B) Provide penalties for violations of regulations;

"(C) Assess against the property concerned any penalty or costs and expenses in compliance with regulations;

"(xxxi) *Take any action to establish, alter and regulate as deemed necessary* the channels of streams, water courses and *any other public water sources* or supplies within the city; \* \* \* " (Emphasis added.)

■ By these statutory provisions, the legislature has expressly conferred upon the City Council of the City of Rawlins not only the power to levy and collect special assessments, but also the separate power to "provide and regulate" for a system of sewers and to take "any action to establish, alter and regulate as deemed necessary" a public water supply. There is no suggestion in the statute that the powers to provide sewer and water systems is conditioned by the power to levy and collect special assessments.

■ Wyoming municipalities have also been vested with powers to enact and enforce zoning regulations, with said regulations being designed to:

"(A) Lessen congestion in the streets;

"(B) Secure safety from fire, panic and other dangers;

"(C) Promote health and general welfare;

"(D) Provide adequate light and air;

"(E) Prevent the overcrowding of land;

"(F) Avoid undue concentration of population; and

"(G) *Facilitate adequate provisions for transportation, water, sewerage, schools, parks and other public requirements.*" (Emphasis added.) § 15–1–601(d)(i), W.S.1977 (1980 Replacement).

In addition to the above provisions, § 15–7–101, W.S.1977 (1980 Replacement) reiterates the comprehensive powers of municipalities to construct, maintain and provide sewer and water facilities for their inhabitants. The language of the pertinent subdivisions is:

---

**3.** In this opinion we will refer to the statutory numbers as they appear in the revised Title 15 of the Wyoming statutes even though the questioned ordinances were adopted in 1980 and the revised act was made to be effective January 1, 1981. (Chapter 38, S.L. of Wyoming 1980.)

We will do this, not only because the parties have relied upon the revised numbers in their briefs, but because a comparison of the old title and the revised version has shown the applicable statutory provisions to be in all respects substantially similar to the former sections.

"(a) In addition to all other powers provided by law, any city or town may make public improvements as follows for which bonds may be issued to the contractor or be sold as provided in this chapter to:

   \*     \*     \*     \*     \*     \*

"(ii) *Establish, construct, purchase, extend, maintain and regulate a system of water works,* for the purpose of supplying water for extinguishing fires and for domestic, manufacturing and other purposes. To carry out this power, or to prevent pollution or injury to the streams, springs or source of supply of its water works, ditches or reservoirs, any city or town may go beyond its corporate limits to take, hold and acquire property by purchase or otherwise and may take and condemn all necessary land and property in the manner provided for the condemnation of real estate by railroad companies. Jurisdiction of a city or town shall extend up and along the stream or source of supply for the entire distance occupied by such water works, ditches or reservoirs. Cities or towns may enact ordinances and make all necessary rules and regulations for the government and protection of their water works, ditches and reservoirs, and fix water rates and provide for their collection. All water rent collected except the amount required to pay the expense of maintaining, extending and improving the water works, shall become a part of the water bond fund, and be applied only to the payment of the principal and interest of the bonds issued for the construction, purchase, maintaining or extension of the water works;

"(iii) *Take any action necessary to establish, purchase, extend, maintain and regulate a water system* for supplying water to its inhabitants and for any other public purposes, including:

"(A) Condemnation of property;

"(B) Prescribing and regulating of rates for the use of water; and

"(C) Enacting ordinances for their enforcement and collection.

"(iv) *Establish, construct, purchase, extend, maintain and regulate a system of sewerage;*" (Emphasis added.)

Similar powers are again expressed in § 15–7–502(a)(i), W.S.1977 (1980 Replacement):

"(a) Any city or town may:

"(i) Construct, reconstruct, improve and extend, or acquire, improve, extend and operate a sewerage system, within or without its corporate limits and may apply for and accept loans or grants or any other aid from the United States of America or any agency or instrumentality thereof under any federal law to aid in the prevention and abatement of water pollution, or may borrow money from any other source;"

With respect to revenues derived from operation of a sewerage system the legislature goes on to provide:

"(a) All revenues derived from the operation of the sewerage system shall be set aside as collected and deposited in a special fund to be used only for:

"(i) Paying the cost of operating and maintaining the system;

"(ii) Providing an adequate depreciation fund; and

"(iii) Paying the principal and interest on the bonds issued under this article." § 15–7–507(a), W.S.1977 (1980 Replacement).

Municipalities are also empowered to charge rates for services rendered by the provisions of § 15–7–508, W.S.1977 (1980 Replacement):

"(a) Any city or town borrowing money or receiving grants and improving, constructing or acquiring and improving a sewerage system, shall collect a charge from the users of the system at a rate sufficient to:

"(i) Pay the cost of operating and maintaining the system;

"(ii) Provide an adequate depreciation fund;

"(iii) Pay the principal and interest on the bonds issued; and

"(iv) Repay grants.

"(b) Any city or town owning and operating a sewerage system constructed or acquired under the provisions of any law may provide by ordinance that the users of the system pay a service rate sufficient to pay the cost of operating and maintaining the system and to provide an adequate depreciation fund.

"(c) Any city or town may fix special rates as provided in W.S. 15–7–407."

One of the limitations placed on the power to collect rents or charges for the use of a City's water system is found in § 15–3–305(c), W.S.1977 (1980 Replacement), which provides:

"(c) All water rents collected, except the amount required to pay the expenses of maintaining, extending and improving the water system of the city, shall be applied only to the payment of the principal and interest of the outstanding water bonds until full payment thereof."

When we read the above statutory provisions together, we are convinced that the legislature has chosen to empower municipalities with full authority and control over public water and sewerage systems. The City of Rawlins is therefore not only charged with providing appellant sewer and water services, but it must also "construct, purchase, extend, maintain and regulate" those systems for the benefit of its residents. Section 15–7–101(a)(ii), (iii), and (iv), supra. In carrying out this municipal responsibility, the City of Rawlins has been empowered to take "any action necessary." Section 15–7–101(a)(iii), supra. Not only is the City of Rawlins required to provide appellant and other inhabitants of its incorporated area with sewer and water services, but the City must also charge the users of those systems in order to pay the costs associated with maintaining, operating and expanding them. Sections 15–7–507 and 15–7–508, supra.

Notwithstanding the above-quoted statutory provisions, the appellant contends that the City of Rawlins is not empowered to charge him for connecting to the sewer and water lines, but is only empowered to assess against his property the costs associated with extending the lines to facilitate the apartment project. In arguing this point, appellant points to the provisions of § 15–7–512, W.S.1977 (1980 Replacement):

"(a) Any city or town may make special assessments for the construction of sewers and water mains. The assessments shall be made on all lots and pieces of ground to the center of the block, or if the sewers or water mains are constructed in an alley, then on all lots and pieces of ground to the nearest street or avenue on each side of the alley, extending along the street, avenue or alley, the distance of the improvement, according to the area of the lots or pieces of ground without regard to the buildings or improvements. The amount to be paid by each property holder shall be determined by dividing the expenses of the construction of the proposed sewer or water main among all the property holders for the benefit of whose property the sewer or water main is to be constructed. In the case of unplatted acreage within the city limits, the city or town shall consider that only the first seventy-five (75) feet in each direction from the sewer or water main is benefited and so assessed. However, if any property in an unplatted area is later connected to or receives service from the sewer or water main, that property shall be assessed its proportionate share. The amount to be assessed against each property holder shall be in proportion to the number of square feet each owns to the entire number of square feet assessed for the expense of the construction.

"(b) The city or town may adopt ordinances providing for the manner of sale, redemption and conveyance of lands sold for nonpayment of the special assessments."

In short, appellant argues that the only way for the City of Rawlins to charge him for sewer and water services is for the City to levy a special assessment pursuant to the provisions of § 15–7–512(a), supra, and that in no statute has the legislature expressly given the City the power to charge connection fees. In other words, it is appellant's

position that the City of Rawlins can only fund the expansion of its system through the levying of special assessments and it is without authority to establish funds for this purpose through the collection of connection fees. We disagree.

The question of the power of municipalities to levy sewer and water service connection fees, although one of first impression for us, has been exhaustively developed in the case law. An identical question was addressed in *Rocky Hill Convalescent Hospital, Inc. v. Metropolitan District*, 160 Conn. 446, 280 A.2d 344, 348 (1971), and in holding for the municipality the court concluded:

" * * * By its charter the legislature made the defendant a municipal corporation, with powers to sue and be sued, to hold and convey any estate real or personal, and generally to do all acts necessary and convenient for the building, creation, and maintenance of sewers, sanitary systems and plants for the disposal of sewage, and the control and maintenance of such systems in the public highways and elsewhere throughout the district. Incident to the performance of these duties was the right and power to do those things 'necessary or convenient' to accomplish these purposes."

The Florida Supreme Court has also, on several occasions, looked into the authority of a municipality to require payment of connection fees. In *Cooksey v. Utilities Commission*, Fla., 261 So.2d 129, 130 (1972), the court stated:

" * * * Implicit in the power to provide municipal services is the power to construct, maintain and operate the necessary facilities. The fixing of fair and reasonable rates for utilities services provided is an incident of the authority given by the Constitution and statutes to provide and maintain those services."

The *Cooksey* decision, supra, was followed in *Contractors and Builders Association of Pinellas County v. City of Dunedin*, Fla., 329 So.2d 314, cert. denied 444 U.S. 867, 100 S.Ct. 140, 62 L.Ed.2d 91 (1976), although the challenged ordinance was struck down for the reason that it placed the burden of providing all new capital improvements on new users of the system. The court did, however, recognize the power of the City to impose connection charges on a new user:

" * * * In principle, however, we see nothing wrong with transferring to the new user of a municipally owned water or sewer system a fair share of the costs new use of the system involves." 329 So.2d at 317.

Connection fees, such as those involved in the present dispute, have been upheld by numerous other decisions. See: *Rupp v. Grantsville City*, Utah, 610 P.2d 338 (1980); *Heinrich v. City of Moline*, 59 Ill.App.3d 278, 16 Ill.Dec. 699, 375 N.E.2d 572 (1978); *Homebuilders Association of Greater Salt Lake v. Provo City*, 28 Utah 2d 402, 503 P.2d 451 (1972); *Hayes v. City of Albany*, 7 Or.App. 277, 490 P.2d 1018 (1971); *Associated Homebuilders of the Great East Bay, Inc. v. City of Livermore*, 56 Cal.2d 847, 17 Cal.Rptr. 5, 366 P.2d 448 (1961); *Western Heights Land Corporation v. City of Fort Collins*, 146 Colo. 464, 362 P.2d 155 (1961);

The same decisions that have upheld sewer or water connection charges have also thoroughly discussed appellant's claim that such charges are taxes or assessments which a City cannot validly impose. In *Contractors and Builders Association of Pinellas County v. City of Dunedin*, supra, 329 So.2d at 318–319, the court, in holding that the connection charges were not taxes, noted that the revenues derived were not placed in the general fund but rather they were earmarked for a special fund designed to develop and expand the system. The court also cited from *Hartman v. Aurora Sanitary District*, 23 Ill.2d 109, 177 N.E.2d 214 (1961), where the Illinois Supreme Court observed that such connection fees had been uniformly sustained as service charges rather than a tax. In *Rocky Hill Convalescent Hospital, Inc. v. Metropolitan District*, supra, 280 A.2d at 348, the court held that the connection fees were not assessments. The court in *Hartman v. Aurora Sanitary District*, supra, summed up the problem as follows:

" * * * It is patent that the rapid expansion of our municipalities has rendered inadequate prior facilities developed for the health and welfare of the community. It is only proper that all citizens of the community should share equally in the cost of maintaining a sanitary plant which benefits the health and welfare of the entire community by the proper disposal of sewage.

*       *       *       *       *       *

"We have found that such reasonable charges have been uniformly sustained as a service charge rather than a tax. [Citations.] It is our conclusion that the present statute creates a legitimate method of financing needed extensions of sanitary systems by means of a service or connection charge rather than a general tax." 177 N.E.2d at 218–219.

For other cases on this issue see: *Montgomery Brothers Construction, Inc. v. City of Corvallis*, 34 Or.App. 785, 580 P.2d 190 (1964); *Montgomery Brothers Construction, Inc. v. City of Corvallis*, 34 Or.App. 785, 580 P.2d 190 (1978).[4]

■ Given the above authorities, we come to the conclusion that the Wyoming statutory provisions previously cited grant to the City of Rawlins the power to levy the sewer and water connection charges provided by Ordinance No. 1–80 and Ordinance No. 1B–80. Although no cited statute specifically provides that cities and towns are authorized to charge new users a certain specified fee for connecting or hooking up with the sewer and water systems, we conclude that the authority for such ordinances as those enacted by the City of Rawlins, in this case, can be fairly and necessarily implied from the powers expressly granted in the statutes. We reject both of appellant's contentions, and hold that Ordinance No. 1–80 and Ordinance No. 1B–80, adopted by the City Council of the City of Rawlins, are permissible means through which the City can carry out its duty to regulate, maintain, construct, and operate a unified water and sewer system. Such charges are earmarked for the specific purpose of assisting Rawlins in the payment of Rawlins' bonded indebtedness which has been in response to a continuing need to update its water and sewerage disposal system. Water and sewer line connection charges are a fair and reasonable means for the City to offset the impact placed on its system by the influx of new users. *Hayes v. City of Albany, supra.* As we noted in *Antlers Hotel, Inc. v. Town of City of Newcastle,* 80 Wyo. 294, 341 P.2d 951, 953 (1959):

" * * * [E]very owner of property in a city or town is interested for sanitary purposes that a sewer system should be established throughout the community, and a distinct benefit accrues to every property owner if that is done."

The City of Rawlins acted within the scope of its delegated powers in adopting Ordinance No. 1–80 and Ordinance No. 1B–80, and the charges collected from appellant thereunder were justifiable in all respects.

## THE PARK–DEDICATION ORDINANCE

The appellant also challenges Ordinance No. 7–80 providing for the dedication of park land by subdividers or, at the City's option, a payment of money in lieu thereof. The appellant challenges this ordinance on substantially the same grounds as he challenged Ordinance No. 1–80 and Ordinance No. 1B–80. We therefore will deal with the contentions in a similar manner.

### The Statutes

As with the power to develop sewer and water services, the legislature in § 15–1–103(a), W.S.1977 (1980 Replacement), has indicated the power of Wyoming municipal-

---

4. See also 11 McQuillin Mun Corp (3d Ed), § 31.30(a), p. 230, where it is stated as a general rule that:

"The municipality may fix fees, rents, charges, and rates for making connections with and for using its sewers and drains, outside the municipal limits, as well as within, and may, by law, have a lien upon the property therefore. Sewer charges are usually established by ordinances, the validity of which is presumed.

"Sewer charges and fees are not taxes or special assessments (although occasionally they are so regarded), but are in the nature of tolls or rents paid for services furnished or available." (Footnotes omitted.)

ities to acquire and hold property for public parks. The pertinent subdivisions read:

"(xii) *Sell, convey and transfer any property acquired or held for park purposes* if the city or town has held title to the property for more than ten (10) years and no substantial use has been made thereof for park purposes provided:

\* \* \* \* \* \*

"(xxii) *Establish and regulate parks,* zoological gardens and recreation areas within the city limits and upon land owned, leased or controlled outside of the city limits provided:

"(A) The police court of the city or town has jurisdiction to punish any violator of the ordinances of the city or town governing those areas;

"(B) The state game and fish commission is authorized to furnish to any city or town any game or animals requested, and the city or town shall pay the necessary expenses;" (Emphasis added.)

In general terms, the above-quoted statute expressly provides for the power of all cities and towns to acquire and hold property for use as public parks with the added authority to "regulate" the same. This general power is reiterated in § 15–7–101(a)(ix), W.S.1977 (1980 Replacement), where it is stated:

"(ix) Contract for, purchase and hold lands and water rights and erect thereon amusement halls and buildings to be used for public parks and grounds for the use, benefit and enjoyment of the public; and

"(A) *Enact ordinances, and make all necessary rules and regulations for the protection, maintenance and beautification of any park* located within or without the limits of the city or town;

"(B) Establish, purchase and hold parks on lands outside the corporate limits, if the lands are within thirty (30) miles of the city or town limits;" (Emphasis added.)

The legislature has also authorized municipalities to establish planning commissions for the purpose of formulating master plans for the development of the city's or town's limited land areas. Section 15–1–502, W.S.1977 (1980 Replacement). This commission is then charged with the duty of generating a master plan and regulations which can recommend for instance the "development \* \* \* character and extent \* \* of \* \* \* parks." Section 15–1–503(a)(i), W.S.1977 (1980 Replacement). Also, as we noted earlier, municipalities are vested with broad powers to enact zoning ordinances which can be designed to facilitate "adequate provisions for \* \* \* parks and other public requirements." Section 15–1–601(d)(i)(G), supra.

The appellant correctly points out that there is no statute upon which the City of Rawlins can rely which serves as express authority for the enactment of a park-land dedication ordinance, which also contemplates a plan for the payment of money in lieu of dedication. However, the statutory provisions previously set out clearly and unqualifiedly empower the City of Rawlins to hold and acquire property for the purpose of establishing parks and recreational facilities thereon. With regard to this and the City's power to plan, zone and regulate property development, counsel for the City argues that the power to adopt Ordinance No. 7–80 can be fairly and necessarily implied. We agree.

Courts in other jurisdictions have struggled with park-land dedication ordinances, and the holdings in these decisions are far from consistent. It is fair to say, however, that a majority of the decisions have upheld the power of municipalities to require park-land dedication. Annot., 43 A.L.R.3d 862. In *Jordan v. Village of Menomonee Falls,* 28 Wis.2d 608, 137 N.W.2d 442 (1965), the court upheld an ordinance requiring park-land dedication or a fee in lieu thereof. It was reasoned that the statutes authorizing the formation of a planning commission were designed to facilitate the development of parks and therefore the power to require subdividers to dedicate certain portions of property for park purposes was a reasonable method of offsetting the burden created by the new development on existing facilities. The court also decided that the fee

which could be charged in lieu of actual raw-land dedication was not a tax but rather a charge imposed on the transaction having to do with obtaining plat approval. This holding was followed in *Brookhill Development Ltd. v. City of Waukesha*, 99 Wis.2d 485, 299 N.W.2d 610 (1980), where the court upheld an ordinance requiring dedication or a fee in lieu of dedicating land for school purposes. Similar conclusions were reached in *Frank Ansuini, Inc. v. City of Cranston*, 107 R.I. 63, 264 A.2d 910 (1970), where a regulation requiring park-land dedication was upheld. The court, in that case, reasoned that the natural result of subdividing or new development was increasing pressure on existing facilities coupled with the need for new facilities, so the municipality could properly require a developer to offset these effects by requiring dedication of land. 264 A.2d at 913.

Some courts, however, have expressed concern over the ability of the municipality to require a payment in lieu of the dedication. This hesitation stems from the fear that courts have felt that while the dedication of raw land directly benefits the subdivision, the benefit derived as a result of a payment in lieu of dedication may be somewhat attenuated. As was said in *Aunt Hack Ridge Estates, Inc. v. Planning Commission of the City of Danbury*, 160 Conn. 109, 273 A.2d 880, 885 (1970):

"The test which has been generally applied in determining whether a requirement that a developer set aside land for parks and playgrounds as a prerequisite to the approval of a subdivision plan is whether the burden cast upon the subdivider is specifically and uniquely attributable to his own activity. Where the requirement is uniquely attributable to the subdivider's activity, it has been held to be a permissible exercise of the police power. *Billings Properties, Inc. v. Yellowstone County*, 144 Mont. 25, 394 P.2d 182; *Jenad, Inc. v. Village of Scarsdale*, 18 N.Y.2d 78, 271 N.Y.S.2d 955, 218 N.E.2d 673; *Jordan v. Village of Menomonee Falls*, 28 Wis.2d 608, 137 N.W.2d 442.

"The cases just cited hold that a requirement that the developer dedicate open space to the public is valid on the ground that the burden imposed on him is uniquely attributable to his own activity because the increase in population in the area which will result from that activity is productive of the need for open space. It is to be noted that in both the Jenad and Jordan cases the court also sustained a requirement that the developer pay a sum of money to the municipality as an alternative to providing open space. Other jurisdictions have frowned upon a requirement that a subdivider make a cash payment in lieu of providing land for parks or open space. In *Haugen v. Gleason*, 226 Or. 99, 359 P.2d 108, the basis of the decision was that the required fee was not limited to the direct benefit of the particular subdivision. Still other cases have held the requirement imposed by the regulation to be invalid on the ground that it was beyond the scope of the enabling statute. *Coronado Development Co. v. City of McPherson*, 189 Kan. 174, 368 P.2d 51; *Gordon v. Village of Wayne*, 370 Mich. 329, 121 N.W.2d 823. All of the cases from other jurisdictions to which we have alluded are clearly distinguishable from both the statute and the regulation with which we are concerned. Neither the statute nor the regulation here involved goes as far as those involved in any of the cases referred to, because they do no more than provide that a developer may be required to set aside a park or playground area in his proposed subdivision."

As the quoted portion notes, the courts, in the previously cited Jordan case and in *Jenad, Inc. v. Village of Scarsdale*, 18 N.Y.2d 78, 271 N.Y.S.2d 955, 218 N.E.2d 673 (1966), upheld ordinances providing for dedication of land or payments in lieu thereof. The California Supreme Court reached the same conclusions in *Associated Home Builders of the Greater East Bay, Incorporated v. City of Walnut Creek*, 4 Cal.3d 633, 94 Cal.Rptr. 630, 484 P.2d 606 (1971). There the court, in citing its decision in *Ayres v. City Council of City of Los Angeles*, 34 Cal.2d 31, 207

P.2d 1, 11 A.L.R.2d 503 (1949), noted that it was not imperative that the dedication requirement benefit the new development alone, and it was acceptable if the benefit were to be received by the municipality as a whole. In *Associated Home Builders of the Greater East Bay, Incorporated v. City of Walnut Creek,* supra, however, the court was concerned with a statute which required that payment in lieu of land be utilized for park or recreational facilities for the particular subdivision, but in a footnote the court discussed the rationale behind not requiring any direct benefit to be recovered by the actual parcel of land:

"Amicus curiae Sierra Club urges that the requirement of dedication or the payment of a fee may be justified under the state's police power even if the recreational facilities provided by the subdivider's contribution are not used for the specific benefit of the future residents of the subdivision but are employed for facilities used by the general public. Ordinarily if land within the subdivision is dedicated for a park it may be assumed that those who will reside in the subdivision will make primary use of the park. The problem of connecting the facilities with the use made of them by the subdivision residents arises when a fee in lieu of dedication is required. In view of the provisions of section 11546, we need not decide in the present case whether a subdivider may be compelled to make a contribution to a park which is, for example, not conveniently located to the subdivision. Parenthetically, however, we perceive merit in the position of amicus curiae. It is difficult to see why, in the light of the need for recreational facilities described above and the increasing mobility of our population, a subdivider's fee in lieu of dedication may not be used to purchase or develop land some distance from the subdivision but which would also be available for use by subdivision residents. If, for example, the governing body of a city has determined, as has the city in the present case, that a specific amount of park land is required for a stated number of inhabitants, if this de-

termination is reasonable, and there is a park already developed close to the subdivision to meet the needs of its residents, it seems reasonable to employ the fee to purchase land in another area of the city for park purposes to maintain the proper balance between the number of persons in the community and the amount of park land available. The subdivider who deliberately or fortuitously develops land close to an already completed park diminishes the supply of open land and adds residents who require park space within the city as a whole. A similar rationale was employed in *Southern Pac. Co. v. City of Los Angeles* (1966) 242 Cal.App.2d 38, 51 Cal.Rptr. 197, to uphold an ordinance requiring dedication of property for street widening as a condition of obtaining a building permit. (See also *Bringle v. Board of Supervisors* (1960) 54 Cal.2d 86, 4 Cal.Rptr. 493, 351 P.2d 765; *Jenad, Inc. v. Village of Scarsdale* (1966), 18 N.Y.2d 78, 271 N.Y.S.2d 955, 957–958, 218 N.E.2d 673.)" 94 Cal.Rptr. at 636, n. 6, 484 P.2d at 612, n. 6.

We are aware of the fact that several of the above-cited cases involved construction of statutes; even so, we are of the opinion that the lack of a specific statutory provision in this case is not determinative. We have previously concluded that the broad powers delegated by the legislature can fairly encompass the power to adopt the challenged park-land dedication ordinance. We agree with the rationale expressed in the cases cited that the City of Rawlins could require the appellant to pay a sum in lieu of park-land dedication in order to lessen the impact and pressure on park facilities that result from the influx of inhabitants caused by the development. The limitation on this power is the requirement that any fees collected in lieu of raw-land dedication must be earmarked to accounts for the purpose of acquiring needed park land and maintenance of existing park facilities. Here, the ordinance in question specifies that the funds collected are only to be used for park-land acquisition by the City Council. With this limitation, the

problem of "direct benefit" to the particular subdivision is overcome. Open space is a rare commodity in increasingly impacted Wyoming municipalities and the governing bodies of the various towns and cities can fairly impose requirements, such as those found in Ordinance No. 7–80, to assist them in meeting current and future demands for park land. We hold that Ordinance No. 7–80 was adopted and applied to appellant pursuant to express powers delegated by the legislature and those fairly implied therefrom.

## ATTORNEY'S FEES

In his judgment, the trial judge awarded the City of Rawlins attorney's fees because he found that a contract entered into between appellant and the City required the same. The appellant also challenges this aspect of the judgment and we agree with his position.

The contract entered into between the parties provided:

"WHEREAS, the Owner has requested that the City participate in the acquisition, construction and equipping of a housing project for low income persons pursuant to Section 8 of the United States Housing Act of 1937 as amended and hereinafter referred to as the 'Project', and * * *

"NOW, THEREFORE, for and in consideration of the City's participation with the Owner in the acquisition, construction and equipping of a housing project for low income persons, and further in consideration of the covenants herein contained, it is agreed as follows:

"1. The Owner agrees to reimburse the City, upon appropriate documentation provided by the City, *for all administrative costs and expenses incurred by the City in participating with the Owner in the acquisition, construction and equipping of a housing project for low income persons,* and for which the City is not otherwise compensated for. * * *" (Emphasis added.)

The City claimed that the above emphasized language requiring appellant to reimburse the City for "all administrative costs and expenses" was intended to cover attorney's fees incurred in the present action. The appellant argued that it was never intended that attorney's fees be included.

In reviewing the matter, we look to the rule that holds that attorney's fees are not ordinarily recoverable except where provided by statute or a contract. *Werner v. American Surety Company of New York,* Wyo., 423 P.2d 86 (1967); *Yellowstone Sheep Co. v. Ellis,* 55 Wyo. 63, 96 P.2d 895 (1939). Here, when we read the plain language of the contract, we are unable to find any reference to recovery of "attorney's fees." In order to recover attorney's fees under a contract, the agreement must unequivocally provide for such recovery. Here, we cannot conclude that the term "all administrative costs and expenses" covered recovery of attorney's fees considering the fact that the language "all administrative costs and expenses" refers to expenses incurred in the acquisition, construction and equipping of the housing project. If the parties had intended attorney's fees to be paid by appellant, they should have said so. We, therefore, reverse that portion of the judgment awarding the City of Rawlins attorney's fees.

## CONCLUSION

We are satisfied that this opinion settles all of the issues raised by appellant in his brief. Any corollary issue not addressed was deemed by us to be fairly resolved by the conclusions reached. In summary, each of the challenged ordinances is upheld and the district court's order is affirmed in that regard. The City of Rawlins acted within its statutory authority.

ROONEY, Chief Justice, concurring in part and dissenting in part.

I concur with that part of the majority opinion relating to the award of attorney's fees and that part relating to the inapplicability of the home-rule constitutional amendment to this matter.

I disagree with the majority opinion in its conclusion that the water and sewer connection fees and the fees in lieu of parklands dedication were proper.

## WATER AND SEWER CONNECTION FEES

From a common-sense or practical standpoint there must be something wrong with a situation in which the people[1] in an area being annexed to the city can be made to pay all, or a disproportionate part, of the capital cost of a water and sewer system for the city. The majority opinion creates this situation since there is absolutely nothing in the record to reflect the relationship of the amount of such fees with any aspect of the annexed area. The sewer connection fee for single-family dwellings, multiple-family units, condominiums, etc., is set at $750.00 "per living unit." The water connection fee for standard three-quarter-inch pipe is set at $1,000.00 "for each living unit." The $750.00 and $1,000.00 figures seem to have been plucked out of thin air. There was no evidence to reflect the manner in which these figures came into existence. There was no evidence to support the reasonableness of them. They could just as easily have been $7,500.00 per living unit for a sewer connection and $10,000.00 for each living unit for a water connection—or $75,000.00 for sewer and $100,000.00 for water. Under the majority opinion, such would be proper. As said, common sense and practicality would dictate that such is not proper.

Somewhere in the scheme of this situation, we must set guidelines of reasonableness, or fairness, or uniformity. We cannot say that once a charge is called a "fee," it will have no perimeters, or fairness, or uniformity. The legal restrictions on charges called "rates" or "assessments" are a result of the necessity for uniformity, fairness and practicality. This brings the conclusion that (1) the reasonableness and uniformity of the charge must be addressed in considering the issue, and (2) the extent and nature of the authority to levy the charge—be it called a "fee," an "assessment," or a "rate"—must also be addressed for the same purpose.

The majority opinion purports to not address the reasonableness of the charge, stating in footnote 1 that:

"The briefs and the positions expressed at oral argument reflect that appellant is not challenging the reasonableness of the amount of the charges and is only concerned with the power of the City of Rawlins to adopt them."

There are two things wrong with this statement: One, it is only partially accurate, and two, it is internally inconsistent.

Although it is true that appellant said in oral argument that he was not contesting the reasonableness of the charge, the argument itself did do so. And his brief argued the lack of uniformity and reasonableness of the charges at length. Appellant worded the second issue on appeal in part:[2]

"2. Did the Trial Court err in finding that the water and sewer connection fees * * * were * * * *proportionate* to the burden put upon the facilities of the City by Appellant's apartment complex?" (Emphasis added.)

The complaint sought a declaration, among other things, that the charges were "not proportionate to the benefits received by" appellant. This fact was recited in appellant's brief. He further noted in his brief that the fees were protested by his agent, Mrs. Bricker, on the grounds:

" * * * First, that the tap fees were excessive and unrelated to the costs actually incurred by the City of Rawlins; and second, that no recognition was given and no commensurate reduction in the tap fees charged was afforded as a result of the fact that Appellant's project as a multi-unit complex, requiring but one actual tap for each 24 units and that other communities have conducted studies that

---

1. The developer is charged with paying the fee, but, of course, economic facts of life result in the cost being passed on to the people who will occupy the development.

2. The issue as worded by appellant is quoted in full in the majority opinion.

have revealed that apartments burden the water and sewer systems but a fraction of the amount that single family units burden those facilities. As a result of such readily available statistical information, Ms. Bricker noted that other communities, such as Cheyenne and Gllette [sic], charge a lesser tap fee or development fee for water and sewer fee extension for each apartment than for each single family housing unit."

In arguing the nature of the fee, appellant continually refers in his brief to the necessity for proportionate application of the money to be received. He points to the statutory recognition of the propriety of proportionate assessment in § 15–7–512(a):

*"Any city or town may make special assessments for the construction of sewers and water mains.* The assessments shall be made on all lots and pieces of ground to the center of the block, or if the sewers or water mains are constructed in an alley, then on all lots and pieces of ground to the nearest street or avenue on each side of the alley, extending along the street, avenue or alley, the distance of the improvement, according to the area of the lots or pieces of ground without regard to the buildings or improvements. *The amount to be paid by each property owner* [holder] *shall be determined by dividing the expenses of the construction of the proposed sewer or water main among all of the property holders for the benefit of whose property the sewer or water main is to be constructed . . . . The amount to be assessed against each property holder shall be in proportion to the number of square feet* [* * *] *assessed for the expenses of the construction.* (Emphasis added.)"

Appellant also noted in his brief that he did not make claims on the City for refund of the entire amount paid under protest for water and sewer connection charges and that:

" * * * He had, in the past in other communities, paid more modest tap fees without protest. Those tap fees, connection fees or development fees were not only less than incurred in Rawlins, but were

also graduated in such a way that multi-family housing units were charged a declining rate, recognizing that multi-family units put a lesser burden upon the city's facilities than do single family residences. The City did not respond to Appellant's claim for partial refund and the lawsuit resulted. * * * "

It cannot be said that appellant is not challenging the reasonableness of the charge.

The evidence in this case relative to the foundation for the amount charged for water and sewer connection fees reflected that the water and sewer system in Rawlins in 1977 was not only inadequate but was of great age and little worth; that plans were made to reconstitute the system; that a great portion of the plans have been brought to accomplishment; that the financing (approximately $32 million for water system and $17½ million for sewer system—not including grants) was through bond issues and loans; that a per-person cost was obtained by dividing a present population figure of 12,000 for money already expended together with a future population figure of 20,000 for future expenditures into the cost figures; that the capacity of the development was 306.24 persons; and that 306.24 multiplied by the per-person cost amounts to between $500,000.00 and $700,000.00 as appellant's share.

After presenting the foregoing (60 to 65 percent of the entire trial testimony), it was never tied in in any manner with the ordinance charge of $1,000.00 for water and $750.00 for sewer. These latter charges totaled about $178,000.00 for the development. The foundation for the figures was never evidenced.

Of course, effort to allocate costs per person pursuant to the extensive testimony contains many flaws: Speculation as to future population; allowance for cost of money; failure to recognize depreciation and appreciation of plant; failure to recognize proportionate use of the system; failure to restrict amount of debt attributable to connection charges to that not to be paid for by

*all* users in the future, etc., e.g. if the system would become operative the day before the development went on it, a connection charge of approximately $178,000.00 would be unreasonable as compared to no charge at all if it became operative the day after the development went on it. Both the development and the other City units would receive equal benefits and should bear equal costs. Likewise if the system collapsed from use the day after the development went on it, the connection charge would be unreasonable. The reasonable charge on population basis must be computed by considering the factors of depreciation, etc., as noted.

Furthermore, the 1977 bond issue is subject to payment from *general* revenue, and the other bond issues are subject to payment from user charges and connection fees.

Most of the cases cited in the majority opinion and from which quotations are taken refer to the necessity for connection charges to be fair and reasonable.[3] "Fair" is "non-discriminatory."

> "*Fair.* Having the qualities of impartiality and honesty; free from prejudice, favoritism and self-interest. Just; equitable; even-handed; equal, as between conflicting interests." Black's Law Dictionary (5th Ed.1979), p. 535.

The testimony and computations presented at trial were never tied into the allocation of $1,000.00 and $750.00 charges "per living unit."[4] To allow such to be done does extend the powers of municipal corporations far beyond the intention as expressed in the constitution and statutes. It seems incongruous that municipalities be restricted by law with regard to "taxes," "assessments" and "rates," only to be given a free reign to impose connection charges in any amount without consideration of the reasonableness, fairness or discriminatory nature of them.

"* * * [A]n assessment according to legal intendment is 'A valuation made by authorized persons according to their discretion. It is a valuation of the property of those who are to pay the tax, for the purpose of fixing the proportion which each man must pay.' * * *" *Union Pacific Railway v. Donnellan,* 2 Wyo. 478, 488 (1882).

"(a) The board shall fix the rates for water, sanitary sewer services * * *. The rates shall secure an income sufficient to:

> "(i) Pay the interest charges and principal payments on all bonds issued to pay the purchase price, construction cost, extensions and enlargements of the respective systems as they are due." Section 15–7–407(a), W.S.1977.

"* * * A public utility is entitled to charge and receive for its product or service such rates, and such only, as are just and reasonable.

"The term 'rate' as used in connection with public utilities signifies a charge to the public for a service open to all *and on the same terms;* * * * measured by a specified unit or standard. * * *" (Emphasis added.) 73 C.J.S. Public Utilities, § 13, p. 1008.

" 'It is a principle universally declared and admitted that municipal corporations can levy no taxes, general or special, upon the inhabitants or their property, unless the power be plainly and unmistakably conferred. * * *' " *Town Council of Hudson v. Board of Commissioners Fremont County,* 37 Wyo. 160, 164, 259 P. 1051, 1052 (1927), quoting from 4 Dillon on Municipal Corporations, § 1377.

And see § 15–7–512(a), W.S.1977, *supra.*

Called by whatever name it be, a tax, assessment, rate, fee, or charge, it cannot be proper unless it is fair, reasonable, and

---

**3.** In all but one of these cases, the connection charges amounted to only a few hundred dollars. They usually reflected the approximate amount to be paid for labor and materials necessary to make the connection.

**4.** A "living unit" could have one person, two persons, three persons, four persons, etc. "Population" does not correlate with "living units."

non-discriminatory. It must be based on some formula designed to these ends. On their faces, the $1,000.00 water connection charge and the $750.00 sewer connection charge do not meet these requirements.

## PARKLANDS DEDICATION FEE

I have no quarrel with the general philosophy expressed in the majority opinion relative to the desirability for a city to insure proper dedication by a developer for parklands area within a development. It may even be desirable to provide for a cash payment to a parklands-use fund in lieu of such dedication where the parklands area is already sufficient without the dedication. However, I do not find express or implied powers for a Wyoming city to mandate a cash payment in lieu of parklands dedication in connection with approval *of a subdivision plat.*

It must be recognized that my concern is not addressed to annexation, or zoning, or planning requirements.[5] These factors are not in this case. The land for the development has already been annexed and rezoned without any parklands requirement. It was only when the City directed it to be subdivided that the parklands requirement was introduced.

Section 15–1–415, W.S.1977, provides:

"(a) The owner of any land *within* or contiguous to any city or town may subdivide the land into lots, blocks, streets, avenues and alleys and other grounds under the name of .... addition to the city (town) of .... An accurate map or plat shall be made designating the subdivided land and particularly describing the lots, blocks, streets, avenues and alleys and other grounds of the addition. The lots must be designated by numbers, and the streets, avenues and other grounds by name or numbers.

"(b) The plat shall:

"(i) Be acknowledged before some officer authorized to acknowledge deeds;

"(ii) Have appended a survey made by some competent surveyor with a certificate that he has accurately surveyed the addition, and that the parts thereof are accurately staked off and marked.

"(c) When the map or plat is made out, acknowledged, certified and approved by the governing body, it shall be filed and recorded in the office of the county clerk. When filed it is equivalent to a deed in fee simple to the city or town from the owner, of all streets, avenues, alleys, public squares, *parks* and commons and of that portion of the land set apart for public and city use, or dedicated to charitable, religious or educational purposes. All additions thus laid out are a part of the city or town for all purposes, and the inhabitants of the addition are entitled to all the rights and privileges and subject to all the laws, ordinances, rules and regulations of the city or town.

"(d) The governing body, by ordinance, may compel the owner of any addition to lay out streets, avenues and alleys to correspond in width and direction and be continuations of the streets, ways and alleys in the city or town or other additions thereto. No addition is valid unless the terms and conditions of the ordinance are complied with and the plat submitted and approved by the governing body." (Emphasis added.)

Certainly, this section gives to a city the implied power to require reasonable dedication of parklands in connection with subdividing, but it would be stretching reason to find authorization in it to extract a cash payment in lieu of dedication. See quota-

---

**5.** In their brief, appellees point to § 15–1–501 et seq., W.S.1977, to indicate legislative authorization for the action here taken by them. Such sections concern establishment of a planning commission and resulting procedures. Appellees specifically point to § 15–1–510, W.S.1977, to support their contention. That section provides for establishment of a master street plan and for regulations governing subdivisions of land, which regulations the governing body "may adopt * * * after a public hearing thereon." There is nothing in the record to reflect use by appellees of the powers granted by these sections.

tion in majority opinion from *Aunt Hack Ridge Estates, Inc. v. Planning Commission of City of Danbury,* 160 Conn. 109, 273 A.2d 880, 885 (1970). The majority opinion notes that other cases cited therein are premised on construction of statutes, but the opinion comments "we are of the opinion that the lack of a specific statutory provision in this case is not determinative." I do not agree. I believe it is determinative, and that it becomes judicial legislation to stretch general language authorizing regulation and operation of parklands to include authority to extract a cash fee in lieu of dedication *in a subdivision plat.*